# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 84
In the Matter of Part 60 Put-Back
Litigation.

Deutsche Bank National Trust
Company, &c.,
          Respondent,
          v.
Morgan Stanley Mortgage Capital
Holdings LLC, &c., et al.,
          Appellants.

Brian S. Weinstein, for appellants.
Steven F. Molo, for respondent.
Securities Industry and Financial Markets Association; Miriam R. Albert, et al.; James M. Peaslee, amici curiae.

FAHEY, J.:

Our recent history of cases dealing with residential mortgage-backed securities (RMBS) has a consistent theme: does the contract mean what it says?

Starting in *ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB*

*Structured Prods., Inc.* (25 NY3d 581 [2015]), we held that a trustee's cause of action for breach of the representations and warranties made about the mortgage loans accrued on the closing date, and that the sponsor's failure to repurchase the defective loans did not give rise to a separate cause of action. Then, in *Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.* (30 NY3d 572 [2017]), we held that, where the trustee's claims for damages were "grounded in alleged breaches of the mortgage loan-specific representations and warranties to which the limited remedy"—set forth in a sole remedy provision—applies, the general contract damages claim must be dismissed (*id.* at 577).

We similarly held in *Ambac Assur. Corp. v Countrywide Home Loans, Inc*. (31 NY3d 569 [2018]) that allegations of pervasive breach of the representations and warranties were nevertheless subject to the contract's sole remedy provision (*see id.*at 581-584). We have also considered the application of our procedural statutes to RMBS actions, including CPLR 203 (f) (*see U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 33 NY3d 84 [2019]), CPLR 205 (a) (*see U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 33 NY3d 72 [2019]), and CPLR 202 (*see Deutsche Bank Natl. Trust Co. v Barclays Bank PLC*, 34 NY3d 327 [2019]). Only in *Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts.* (32 NY3d 139 [2018]) did we hold that, to the extent an accrual clause in the parties' contract sought to delay accrual of the breach of contract cause of action, such a clause was unenforceable because it violated New York's public policy prohibiting pre-accrual extensions of the limitations period.

Here, we again conclude that the parties' contract, as written, means what it says.

In this RMBS put-back action, plaintiff seeks to avoid a provision in the contract—similar to the provisions at issue in *Nomura* and *Ambac*—that sets out a sole remedy for a breach by alleging that defendants breached the contract with gross negligence. This sole remedy provision purports to limit, but not eliminate, the remedies available to the plaintiff in the event of a breach. We conclude that, in a breach of contract action, the public policy rule prohibiting parties from insulating themselves from damages caused by grossly negligent conduct applies only to exculpatory clauses or provisions that limit liability to a nominal sum. The rule does not apply to contractual limitations on remedies that do not immunize the breaching party from liability for its conduct. The sole remedy provision is not an exculpatory or nominal damages clause. Plaintiff cannot render it unenforceable through allegations of gross negligence.

## I.

### Facts and Procedural History

Plaintiff Deutsche Bank National Trust Company is the trustee for the Morgan Stanley ABS Capital I Inc. Trust 2007-NC4 (the Trust). Defendant Morgan Stanley Mortgage Capital Holdings LLC is the successor to the sponsor for the RMBS transaction at issue, and defendant Morgan Stanley ABS Capital I, Inc. is the depositor.[1] Pursuant to

---

[1] "[A]n RMBS transaction involves the bundling of mortgage loans into a pool that is sold to an affiliated purchaser, which then places the loans into a trust for securitization purposes. The trust then issues certificates that are purchased by investors, or certificateholders. The individual mortgage loans served as collateral for the certificates, which paid principal and interest to certificateholders from the cash flow generated by the mortgage loan pool; that is,

a Representations and Warranties Agreement (RWA) and a Pooling and Servicing Agreement (PSA), 5,337 residential mortgage loans were placed into a pool for securitization. In the RWA and the PSA, defendants made certain representations and warranties regarding the mortgage loans. Plaintiff now alleges, on behalf of the Trust, that the vast majority of the loans in the pool did not comply with those representations and warranties. The RWA and PSA each contained a "sole remedy provision," which provided that if a loan in the pool materially breached a representation and warranty, plaintiff's sole remedy in the event of such breach would be defendants' obligation to cure the breach or repurchase the loan at the contractually defined Repurchase Price.[2]

Plaintiff's complaint alleged three causes of action, all sounding in breach of contract. Plaintiff also alleged that defendants were "grossly negligent" in failing to comply with their obligations under the contracts. Specifically, plaintiff alleged that

certificateholders made money when the borrowers made payments on their loans. High default rates by borrowers led to the collapse of the subprime housing market, a primary factor in the ensuing precipitous market decline and recession" (*Deutsche Bank Natl. Trust Co. v Barclays Bank PLC*, 34 NY3d 327, 331-332 [2019] [internal quotation marks and citations omitted]).

[2] Specifically, the RWA stated that "[i]t is understood and agreed that the obligation of the Sponsor set forth in Section 4(a) to repurchase for a Mortgage Loan in breach of a representation or warranty contained in Section 2 constitutes the sole remedy of the Depositor or any other person or entity with respect to such breach." The PSA similarly provided that "[i]t is understood and agreed by the parties hereto that the obligation of the Depositor under this Agreement or of the Sponsor under the [RWA] to cure, repurchase, or substitute any Mortgage Loan as to which a breach of a representation and warranty has occurred and is continuing, shall constitute the sole remedies against such Persons respecting such breach available to the Certificateholders . . . or the Trustee on their behalf."

defendants were grossly negligent in failing to notify plaintiff of the nonconforming loans and in failing to cure or repurchase those defective loans. Plaintiff sought specific performance, "compensatory, consequential, and punitive damages," and attorneys' fees. Defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7). Defendants argued that the sole remedy provision was enforceable despite plaintiff's allegations of gross negligence because gross negligence could render unenforceable only exculpatory or nominal damages clauses, and the sole remedy provision was neither. Defendants also sought dismissal of plaintiff's claims for punitive damages and attorneys' fees. Plaintiff argued that gross negligence should render unenforceable any contractual provision that restricted the types of remedies or amount of damages available to the non-breaching party.

With respect to plaintiff's first cause of action alleging a breach of the representations and warranties, Supreme Court held that the sole remedy provision was enforceable. The court granted defendants' motion to the extent of dismissing plaintiff's claims for damages on the first cause of action as well as plaintiff's claims for punitive damages and attorneys' fees. Plaintiff appealed from Supreme Court's order, challenging the dismissal of its first cause of action for breach of the representations and warranties to the extent plaintiff sought compensatory damages inconsistent with the sole remedy provision. Plaintiff also challenged the dismissal of its claims for punitive damages and attorneys' fees.[3]

---

[3] Supreme Court also dismissed plaintiff's second cause of action alleging a breach of defendants' obligation to comply with the cure or repurchase protocol (*see ACE Sec.*

The Appellate Division reversed, denying defendants' motion to dismiss plaintiff's cause of action for breach of the representations and warranties to the extent plaintiff sought compensatory damages beyond those contemplated by the sole remedy provision and to dismiss plaintiff's claims for punitive damages and attorneys' fees (169 AD3d 217 [1st Dept 2019]). The Court concluded that the complaint's allegations of gross negligence were sufficient to render the sole remedy provision unenforceable (*see id.* at 219, 224-225, citing *Morgan Stanley Mtge. Loan Trust 2006-13ARX v Morgan Stanley Mtge. Capital Holdings LLC*, 143 AD3d 1 [1st Dept 2016] [hereinafter *2006-13ARX*]). The Court reasoned that it could not determine, at this stage of the litigation, whether the sole remedy provision would actually make the investors whole (*see id.* at 225).

The Appellate Division further reinstated the claim for punitive damages, holding that the complaint adequately pleaded the elements of such a claim pursuant to this Court's decision in *New York Univ. v Continental Ins. Co.* (87 NY2d 308 [1995]) (*see* 169 AD3d at 225-226). Finally, the Court held that plaintiff's claim for attorneys' fees was improperly dismissed (*see id.* at 226).

The Appellate Division granted defendants leave to appeal to this Court. We now reverse.

## II.

### Sole Remedy Provision

Plaintiff's first cause of action, to the extent it sought compensatory damages for

---

*Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc.*, 25 NY3d 581, 589 [2015]). Plaintiff did not appeal from that portion of Supreme Court's order.

defendants' breach of the representations and warranties, should be dismissed. In a pure breach of contract case, where a defendant's conduct does not give rise to separate liability in tort, the public policy rule prohibiting parties from immunizing themselves from liability for grossly negligent conduct applies only to exculpatory or nominal damages clauses, and the sole remedy provision is neither.

A.

In New York, contractual exculpatory clauses intended to insulate a party from liability for its own negligence are enforceable, albeit disfavored and closely scrutinized, so long as the contract language is clear and unequivocal and the clause does not violate statutory law or a separate rule of public policy (*see Lago v Krollage*, 78 NY2d 95, 99-100 [1991]; *Ciofalo v Vic Tanney Gyms*, 10 NY2d 294, 296-297 [1961]). Furthermore, " '[c]ontract terms providing for a sole remedy are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction . . . especially when entered into at arm's length by sophisticated contracting parties' " (*Ambac*, 31 NY3d at 581-582, quoting *Nomura*, 30 NY3d at 582). "It is well settled that 'courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities' " (*id*. at 581, quoting *Nomura*, 30 NY3d at 581).

On the other hand, it is equally well settled that public policy "forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by 'grossly negligent conduct' " (*Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d

821, 823 [1993], quoting *Sommer v Federal Signal Corp.*, 79 NY2d 540, 554 [1992]; *see*

*Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 384-385 [1983]; *Gross v Sweet*, 49

NY2d 102, 106 [1979]).   Gross negligence "differs in kind, not only degree, from claims

of ordinary negligence" (*Colnaghi*, 81 NY2d at 823).   "Gross negligence, when invoked to

pierce an agreed-upon limitation of liability in a commercial contract, 'must smack[] of

intentional wrongdoing' " or "evince[] a reckless indifference to the rights of others"

(*Sommer*, 79 NY2d at 554, quoting *Kalisch-Jarcho*, 58 NY2d at 385).[4]

In light of two potentially competing lines of precedent, we must consider whether

the sole remedy provision here may be rendered unenforceable by plaintiff's allegations

that "a breach of contract occurred as a result of gross negligence" (*Abacus Fed. Sav. Bank*

*v ADT Sec. Servs., Inc.*, 18 NY3d 675, 684-685 [2012]).

B.

We have previously considered the application of the gross negligence public policy

rule only in cases where the contract provision at issue was an exculpatory clause,

purporting to wholly immunize a party from liability, or a nominal damages clause limiting

damages to, at most, $250 (*see Abacus*, 18 NY3d at 681; *Colnaghi*, 81 NY2d at 823;

*Sommer*, 79 NY2d at 549; *David Gutter Furs v Jewelers Protection Servs.*, 79 NY2d 1027,

1029 [1992]).[5]   We have not yet determined whether grossly negligent conduct may render

---

[4] Plaintiff does not contend here that any statute or different public policy rule could render the sole remedy provision unenforceable.

[5] Although we used the phrase "liquidated damages clauses" in *Abacus* (18 NY3d at 683), that was dicta.   The contracts at issue in *Abacus* both "contained clauses that exculpated defendants from liability for their own negligence and limited their liability,

unenforceable contractual provisions that do not wholly insulate a party from liability for its breach, but instead impose reasonable limitations on either liability or the remedies available to the non-breaching party.  We conclude that, in a breach of contract case, grossly negligent conduct will render unenforceable only exculpatory or nominal damages clauses, and the public policy rule does not extend to limitations on the remedies available to the non-breaching party.

This conclusion is in keeping with the secondary sources laying the groundwork for the rule.  The Restatement (Second) of Contracts provides that "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy" (Restatement [Second] of Contracts § 195 [1] [1979]).  That is consistent with the rule announced by the first Restatement in 1932 (*see* Restatement [First] of Contracts § 575 [1932] ["A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal"]).  When articulating the rule in our decisions, we have relied on these Restatement provisions, as well as Williston on Contracts (*see Sommer*, 79 NY2d at 554; *Kalisch-Jarcho*, 58 NY2d at 385; *Gross*, 49 NY2d at 106).  That treatise similarly provided that "[a]n attempted exemption from liability for a future intentional tort or for a future willful act or one of gross negligence is void" (15 Williston on Contracts § 1750A at 141 [3d ed 1972]).  The use of the word "exempt" in these secondary sources suggests total immunity from liability (*see* Black's Law Dictionary 717 [11th ed 2019], exemption ["Freedom from a duty, liability, or other requirement; an exception"];

---

under all circumstances, to $250" (*id.* at 681).  Those clauses were therefore exculpatory and nominal damages clauses, respectively.

Merriam-Webster Online Dictionary, exemption [https://www.merriam-webster.com/dictionary/exemption] ["the act of exempting or state of being exempt : IMMUNITY"]).

Other authorities also have recognized the difference between exculpatory clauses and clauses merely limiting liability. Williston on Contracts quoted an Appellate Division decision for the following proposition:

> " 'A total immunity clause is bad; a limitation provision, if reasonable, is not. In truth, the rule rests not so much on the basis that the immunity provision may be avoided for fraud in the inducement of the contract, but on the principle that the provision is illegal, and therefore null, because it violates public policy' " (15 Williston on Contracts § 1750A at 147 [3d ed 1972], quoting *Soviero Bros. Contr. Corp. v City of New York*, 286 App Div 435, 441 [1st Dept 1955], *affd without op* 2 NY2d 924 [1957]; *see also* 15 Corbin on Contracts § 85.18; *cf. Boyle v Bush Term. R.R. Co.*, 210 NY 389, 392 [1914] ["(T)he contract in this case did not provide for exemption from liability. On the contrary, the agreement fixed the value of the goods and thereby measured the liability of the carrier for damage or loss, whether from negligence or otherwise"]).

Limiting the scope of the gross negligence public policy exception to exculpatory and nominal damages clauses in breach of contract cases is also consistent with the public policy concerns animating the rule. When a party engages in conduct that smacks of intentional wrongdoing or evinces reckless disregard for the rights of others (*see Sommer*, 79 NY2d at 554), public policy will not permit that actor to escape all liability for its misconduct. Furthermore, policy does not allow the party injured as a result of such wrongdoing to be left uncompensated for its losses. These public policy concerns do not apply with equal force where, as here, sophisticated commercial parties choose a remedy

that will be available in the event of a breach of contract to the exclusion of others.

Moreover, we will enforce the bargain that contracting parties have freely made, " '[a]bsent some violation of law or transgression of a strong public policy' " (*Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts.*, 32 NY3d 139, 154 [2018], quoting *Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 67-68 [1978]).  Freedom to contract itself is "deeply rooted in public policy" (*J.P. Morgan Sec. Inc. v Vigilant Ins. Co.*, 21 NY3d 324, 334 [2013] [internal quotation marks omitted]).  "Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain" (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]).  When the clause limiting liability is negotiated at arm's length by sophisticated parties, provides for more than nominal damages, and does not wholly exculpate the breaching party, the rationales underlying the gross negligence public policy exception fail to overcome the public policy in favor of freedom of contract, where, as here, the only causes of action raised in the complaint sound in breach of contract.

We decline to extend the scope of this public policy rule in a breach of contract case to invalidate limitations on liability or remedies available to the non-breaching party. Rather, in a breach of contract case, grossly negligent conduct will render unenforceable only exculpatory or nominal damages clauses.

## C.

The sole remedy provision at issue here is neither an exculpatory clause nor a nominal damages clause.  "Exculpatory clauses immunize a party from liability for its own

misconduct" (*A.H.A. Gen. Constr. v New York City Hous. Auth.*, 92 NY2d 20, 30 [1998], *rearg denied* 92 NY2d 920 [1998]).  The sole remedy provision does not immunize defendants from liability for a breach of the representations and warranties.  Nor does it limit plaintiff's damages to a nominal sum.  Instead, the sole remedy provision provided a mechanism by which defendants could correct the breach—cure or repurchase of a nonconforming loan—which was intended to make the Trust whole.

Plaintiff argues that the Appellate Division correctly concluded that it cannot be determined at this stage of litigation whether the sole remedy provision will make the Trust whole (*see* 169 AD3d at 225).  We disagree.  The Appellate Division's conclusion is based on its previous decision in *2006-13ARX*.  There, that Court recognized that it had held in a previous RMBS case, *Nomura*, that the specific performance of cure or repurchase might be impossible in cases where the nonconforming loans have been foreclosed upon or liquidated (*see 2006-13ARX*, 143 AD3d at 9, citing *Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.*, 133 AD3d 96, 106 [1st Dept 2015]).  In that situation, the Court had held that where the granting of equitable relief in the form of specific performance was impossible, equity may award damages in lieu of specific performance (*see Nomura*, 133 AD3d at 106).  In *2006-13ARX*, the Appellate Division noted that *Nomura* was then pending at the Court of Appeals, and therefore that "[t]he issue of whether the sole remedies clauses in these contracts will make the investors whole cannot be ascertained at this stage of the litigation, militating in favor of permitting the allegations of gross negligence to remain" (*2006-13ARX*, 143 AD3d at 9).  The Appellate Division relied on that holding in its decision below to conclude that, at this stage of

litigation, the issue of whether the sole remedy provision will operate as an exculpatory clause cannot yet be determined (*see* 169 AD3d at 225).

In *Nomura*, however, the parties to the appeal did not raise that issue before this Court (*see Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.*, 30 NY3d 572 [2017]). Although the order in *2006-13ARX* was also appealed to this Court, the appeal was withdrawn by stipulation of the parties before this Court could consider it (*see* 32 NY3d 1001 [2018]). This Court therefore has not yet considered, let alone overruled, the Appellate Division's conclusion that where specific performance of cure or repurchase is impossible, a plaintiff in an RMBS case may pursue monetary damages in lieu of specific performance.

Defendants concede that the Appellate Division's holdings on that issue are "binding law in this case." More specifically, defendants concede that "if a breaching loan has already been liquidated, the defendant will still be liable to pay the Repurchase Price, and thereby make the Trust whole, even if actual repurchase of the loan (i.e., specific performance) is impossible because the loan no longer exists." Based on this concession, the Appellate Division erred in concluding that it cannot be ascertained at this stage of the litigation whether the sole remedy provision is "illusory." Defendants are bound by the Appellate Division's precedent and their concessions in this case, regardless of what this Court may ultimately decide on that issue, if and when it is raised before us. For that reason, the sole remedy provision cannot be said to be exculpatory or illusory in this particular case.

Moreover, as a general matter, whether a contractual provision constitutes an

exculpatory clause cannot depend upon a legal ruling this Court may make in some unrelated litigation at some unspecified point in the future. Such a rule could leave RMBS litigation in limbo indefinitely and would be destabilizing to the uniformity and predictability that is the foundation of New York contract law (*see Deutsche Bank Natl. Trust Co.*, 34 NY3d at 342). Instead, we examine the plain language of the contracts to determine whether the sole remedy provision was intended to immunize defendants from liability for a breach. We conclude that the sole remedy provision was not intended to exculpate defendants from liability for a breach but rather was intended by the parties to provide a remedy for the breach, albeit an exclusive one, that would make the Trust whole.

Plaintiff's contention that that the pervasive nature of the breaches will make it impossible for plaintiff to prove its case on a loan-by-loan basis has previously been considered and rejected by this Court as a basis to render the sole remedy provision unenforceable (*see Nomura*, 30 NY3d at 585; *Ambac*, 31 NY3d at 581-584). Plaintiff's remaining arguments as to why the sole remedy provision is an exculpatory clause are without merit.

For these reasons, we conclude that the sole remedy provision at issue here is not an exculpatory or nominal damages clause and, under the circumstances of this case, is not subject to the gross negligence public policy exception. The allegations of gross negligence in the complaint therefore cannot render the sole remedy provision unenforceable.[6]

---

[6] In light of this conclusion, we do not consider whether plaintiff's complaint sufficiently alleged conduct by defendants that, if true, constituted gross negligence (*cf. Abacus*, 18

D.

Our dissenting colleague reasonably points out the enormous damage to the economy and the investing public that resulted from the 2008 financial crisis, damage that defendants here allegedly contributed to by ignoring their contractual obligations to deliver loans that complied with the representations and warranties they had made (*see* dissenting op at 3-7). We do not intend to condone that alleged misconduct or to minimize the suffering that the economic crisis inflicted upon homeowners and families throughout this State. We nevertheless respectfully disagree with our dissenting colleague that a different outcome is warranted in this case, for several reasons.

As we have repeatedly emphasized, where, as here, the causes of action alleged in the complaint sound purely in breach of contract, the gross negligence public policy exception may render unenforceable only exculpatory or nominal damages clauses. Notably, some cases do not clearly sound in either tort or contract and instead fall into the "borderland between tort and contract" (*Sommer*, 79 NY2d at 550). In some of those cases, where the relationship between the parties is formed by contract, the defendant's conduct also gives rise to separate liability in tort arising from a duty of care independent of the contract, which duty of care may be breached by the same conduct constituting the contractual breach (*see id.* at 550-553).

For the reasons explained below (*see infra* at 18-19), that is not the case here.

---

NY3d at 683-684). In a breach of contract case where exculpatory or nominal damages clauses are at issue, a plaintiff seeking to render those clauses unenforceable pursuant to this public policy rule must sufficiently plead, and ultimately prove, allegations of gross negligence (*see id.*).

Plaintiff does not contend, at least insofar as it seeks compensatory damages for breach of contract, that defendants have committed some independent tort or violated a duty of care separate from their obligations under the contracts. Instead, plaintiff contends that although it did not plead a tort claim for gross negligence, the sole remedy provision is void as against public policy because plaintiff alleged that defendants breached certain of their contractual obligations in a "grossly negligent manner." In support of that contention, plaintiff cites our decision in *Abacus*. There, the Court held that the plaintiff's complaint "did not allege conduct that would give rise to separate liability in tort" and that "the allegations that a breach of contract occurred as a result of gross negligence does not give rise to a duty independent of the contractual relationship" (*Abacus*, 18 NY3d at 684-685). The Court nevertheless reinstated the plaintiff's breach of contract action against one defendant and held that, if the plaintiff could prove its sufficiently pleaded allegations of gross negligence, it could seek damages despite the exculpatory and nominal damages clauses in the contracts pursuant to this public policy rule (*see id.* at 683-684).

In *Abacus*, however, the limitation provisions at issue there "exculpated defendants from liability for their own negligence and limited their liability, under all circumstances, to $250" (*id.* at 681). Those were clearly exculpatory and nominal damages clauses, and we based our holding in *Abacus* on *Sommer*'s rule that exculpatory and nominal damages clauses in contracts are not enforceable against allegations of gross negligence (*see id.* at 683, citing *Sommer*, 79 NY2d at 554). We have never extended that rule to a contractual provision other than one that was exculpatory or nominal, and we decline to do so here. Our holding about the scope of the public policy rule today applies solely to cases that, like

this one, sound purely in breach of contract. We express no opinion on the scope of the gross negligence public policy rule in cases that involve cognizable tort claims or claims that straddle the line between contract and tort.[7]

The dissent alternatively posits that defendants *have* breached an independent duty of care, for reasons similar to those articulated in *Sommer*. The dissent therefore reaches the issue we leave open here, i.e., the scope of the gross negligence public policy rule to cases that fall in the borderland between tort and contract (*see* dissenting op at 25-28). Although the dissent's arguments regarding the "catastrophic consequences" of subprime RMBS securitizations on a global scale are not without merit, they are not reflected in the complaint filed in this particular case. Indeed, here, plaintiff's allegations of gross negligence in the complaint related solely to defendants' failure to either notify plaintiff of defective loans or to comply with the cure or repurchase protocol for those defective loans. Specifically, plaintiff alleged that defendants "were grossly negligent in failing to identify and cure breaches of their representations and warranties"—not with respect to the truth or falsity of the representations and warranties when made.

The remedy of cure or repurchase was intended to make the Trust whole for defective loans in the pool, and defendants have conceded that if specific performance is impossible, they will be obligated to pay the Repurchase Price for nonconforming loans. Although that remedy of course does not compensate the public for its losses resulting from

---

[7] For that reason, we express no opinion on the dissent's hypothetical example of an alternative limitation on liability in *Sommer* (*see* dissenting op at 21-22). This Court held that the plaintiff's claims in *Sommer* "lie in tort as well as contract" (*Sommer*, 79 NY2d at 552-553). *Sommer* therefore was not a pure breach of contract case.

the 2008 financial crisis, plaintiff here seeks recompense only for the losses to the Trust.[8]

We conclude that plaintiff is bound by the agreement it made.

III.

Punitive Damages and Attorneys' Fees

We further conclude that Supreme Court properly dismissed plaintiff's claims for punitive damages and attorneys' fees.

The "pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract" are: "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature . . . ; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally" (*New York Univ.*, 87 NY2d at 316). "Where a lawsuit has its genesis in the contractual relationship between the parties, the threshold task for a court considering defendant's motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract" (*id.*). For punitive damages to arise, the defendant must have violated a duty "apart from and independent of promises made" in the contract (*id.* [internal quotation marks omitted]). In other words, the defendant must have "engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations" (*id.*). "[W]here a party is merely seeking to

---

[8] As the dissent points out (*see* dissenting op at 26-27), there are other regulatory and enforcement mechanisms, outside the context of individual breach of contract actions between RMBS parties, that are intended to compensate the public for the kind of harm the dissent identifies. Whether or not those mechanisms have been effective or satisfying in the wake of the 2008 financial crisis, it does not transform the nature of the dispute before us in this case.

enforce its bargain, a tort claim will not lie" (*id.*).

Here, plaintiff alleges that defendants failed to deliver mortgage loans that complied with the representations and warranties defendants made in the contracts. A cause of action based on the failure to deliver an item of a bargained-for quality sounds purely in breach of contract (*see Sommer*, 79 NY2d at 552; *Bellevue S. Assoc. v HRH Constr. Corp.*, 78 NY2d 282, 294-295 [1991]). Plaintiff therefore is merely seeking to enforce its bargain (*see New York Univ.*, 87 NY2d at 316). Plaintiff's assertion that defendants committed fraud by entering into the relevant contracts with no intention of delivering loans that complied with the representations and warranties does not require a different conclusion. "General allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient" to support a claim for fraud (*id.* at 318).

The Appellate Division relied on an order from the Securities and Exchange Commission (SEC), attached to the complaint, to support its conclusion that the claim for punitive damages could proceed (*see* 169 AD3d at 225-226). The SEC found that, with respect to this RMBS securitization and one other, defendants defrauded investors by misstating the delinquency rate of the loans in the pool. Defendants' misstatement of the delinquency rate, however, is another example of defendants' alleged failure to comply with the representations they made about the quality and characteristics of the loans in the pool, which is the gravamen of the breach of contract cause of action. Indeed, plaintiff concedes that defendants made representations and warranties regarding the delinquency rate of the loans in the pool in the PSA. "In this situation where the bargained-for consideration has failed to meet the expectations of the purchaser," the remedy lies in

contract (*Bellevue*, 78 NY2d at 294). The SEC order therefore does not demonstrate that defendants committed independently tortious conduct that is separate and distinct from the conduct giving rise to the breach of defendants' contractual obligations to plaintiff (*see New York Univ.*, 87 NY2d at 316).[9]

Finally, Supreme Court properly dismissed plaintiff's claim for attorneys' fees. New York follows the general rule that "attorney's fees are incidents of litigation and a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule" (*Hooper Assoc. v AGS Computers*, 74 NY2d 487, 491 [1989]). Courts must not "infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise" (*id.* at 492; *see e.g. Mount Vernon City School Dist. v Nova Cas. Co*., 19 NY3d 28, 39-40 [2012]; *Ambac*, 31 NY3d at 584).

Plaintiff's claim for attorneys' fees relies on the PSA's definition of the Repurchase Price, which refers to the trustee's ability to recover the "costs and expenses" it incurs arising out of a breach, including costs and expenses related to its "enforcement of the repurchase obligation of the Depositor or Sponsor." This language does not meet the "unmistakably clear" standard of *Hooper*. Depending on the context, "costs and expenses" may not encompass attorneys' fees (*see e.g. Waverly Mews Corp. v Waverly Stores Assoc.*, 294 AD2d 130, 132 [1st Dept 2002]). That is especially true here, where the PSA expressly

---

[9] Inasmuch as plaintiff's claim for punitive damages fails on the first element, we do not address the remaining three elements. We express no opinion on whether the SEC order is relevant to allegations of fraud against defendants in a different context.

refs to attorneys' fees or legal fees more than a dozen times in separate provisions, but the parties used the phrase "costs and expenses" in the Repurchase Price definition.

Accordingly, the order of the Appellate Division should be reversed, with costs, the order of Supreme Court reinstated and the certified question answered in the negative.

RIVERA, J. (dissenting in part):

This appeal presents another wrinkle in the now familiar residential mortgage-backed securitization (RMBS) litigation that has consumed New York courts for more than a decade. The parties ask us to resolve whether the RMBS agreements limit the plaintiff's remedies for defendants alleged grossly negligent breach of their representations and warranties.

The applicable legal principles favor plaintiff. First, it is the public policy of this state that a defendant cannot insulate itself from the consequences of its grossly negligent conduct by contracting away its liability (*Sommer v Federal Signal Corp.*, 79 NY2d 540, 554 [1992]; *Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 384-385 [1983]; *Gross v Sweet*, 49 NY2d 102, 106 [1979]). Second, an agreement on the type and amount of damages available in the event of a breach is unenforceable where the amount is unreasonable compared to the alleged damages incurred (*Trustees of Columbia Univ. in City of New York v D'Agostino Supermarkets, Inc.*, No. 40, 2020 NY Slip Op 06937, at *4 [2020]; *Sommer*, 79 NY2d at 553-54; *Wilson Trading Corp. v David Ferguson, Ltd.*, 23 NY2d 398, 405 [1968]). Third, a defendant may be liable for gross negligence when its actions give rise to a duty "independent of the contractual relationship" (*Abacus Fed. Sav. Bank v ADT Sec. Servs., Inc.*, 18 NY3d 675, 685 [2012]; *see also Sommer*, 79 NY2d at 553). As the Court has explained, a defendant's duty to act with reasonable care may stem from "the nature of the injury, the manner in which the injury occurred and the resulting harm[,]" including where there is a duty to the public to avoid a breach with "catastrophic consequences" (*Sommer*, 79 NY2d at 552-553).

Nevertheless, the majority holds that the RMBS trustee may not recover damages for gross negligence beyond the remedy provided in the transaction agreements because the remedy provides more than nominal relief (*see* majority op at 16). It further concludes that, despite plaintiff's allegations of violations of federal securities law in this highly regulated industry, plaintiff has failed to allege an independent legal duty of reasonable care (*see id.* at 17). The majority's new rule undermines the public policy in deterring gross

negligence and ignores the public's interest in holding financial institutions accountable when they fail to exercise reasonable care in the RMBS market.

The approach adopted by the majority accommodates intentional irresponsible conduct by parties with a track record of disregarding regulatory requirements and industry standards of practice. Therefore, I dissent from that part of the majority decision that insulates defendants from the plaintiff's claims for compensatory and punitive damages.

## I.

### A. RMBS and the Economic Meltdown

In order to resolve the question before us, we must locate plaintiff's claim in its historical context. Since 1970, financial institutions in the United States have engaged in RMBS transactions by pooling home-mortgage loans in trusts and selling beneficial-ownership interests in the pooled loans to investors (U.S. Securities and Exchange Commission, *Staff Report: Enhancing Disclosure in the Mortgage-Backed Securities Disclosure* § II [C] [Jan 2003]; Securitization Fin. Assets § 16.02 [A] [1]). Specifically, "a 'sponsor' reviews the loan origination files and sells those loans to an entity known as the 'depositor'.… The depositor transfers (or 'deposits') the loans into a trust—which is controlled by a 'trustee' for the benefit of its security holders—in exchange for debt securities in the trust" (*see Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc Natl. Assn.*, 30 NY3d 572, 597 [2017] [Rivera, J., dissenting] [hereinafter *Nomura*]). As borrowers pay off their mortgages, the proceeds pass through the trust and are used to make payments to investors in accordance with a priority scheme

detailed in the securitization documents. Bundling mortgages in this way reduces the risks posed by individual loans. "Securitization thus enables financial diversification and transfer of risk from mortgage lenders to investors" (*id.* at 597-598). Given the money to be made by diluting risk in this way, for decades mortgage-backed securities have served in the United States and abroad as a popular and lucrative investment vehicle (*id.*).

Investors purchasing interests in RMBS "rely on the sponsor's warranties and representations—as the entity responsible for assessing and selecting the loans to be included in the trust—to ensure that the loan pools are as they purport to be" (*id.* at 598). "[I]nstitutional investors usually have to make snap judgments whether to invest without time for any substantive due diligence; most simply rely on lenders, underwriters, and rating agencies" (*id.* at 598 n 2, citing Kathleen C. Engel & Patricia A. McCoy, *Turning a Blind Eye: Wall Street Finance of Predatory Lending*, 75 Fordham L Rev 2039, 2061, 2068 [2007] [internal quotation marks omitted]). Similarly, "[s]econdary market purchasers . . . demand contractual protections to mitigate" the danger to the investment vehicle posed by high-risk loans (*id.*).

The popularity of securitization, and the willingness of financial institutions to underrate or misrepresent high-risk mortgages, led to calamity and financial ruin in the late 2000s. In the lead up to 2008, large Wall Street firms "joined with numerous ground-level lenders to mine the home equity of the large numbers of Americans who were squeezed by modest incomes, meager government services, and rising debt" (Martha T. McCluskey, *How the "Unintended Consequences" Story Promotes Unjust Intent and Impact*, 22

Berkeley La Raza LJ 21, 22-23 [2012]). The lenders offered these borrowers loans that they could not afford, commonly referred to as subprime mortgages, in order to meet the financial market's voracious demand for mortgage-backed securities (*id.*). Inevitably subprime mortgagors began to default, setting into motion a financial conflagration known as the Great Recession (*id.*; Steven L. Schwarcz, *Misalignment: Corporate Risk-Taking and Public Duty*, 92 Notre Dame L Rev 1, 3 [2016]).

Between 2007 and 2009, the stock market lost $8 trillion in value and Americans lost $9.8 trillion "in wealth as their home values plummeted and their retirement accounts vaporized" (Renae Merle, *A Guide to the Financial Crisis – 10 Years Later*, The Washington Post [Sept. 10, 2018, 1:47 PM], https://www.washingtonpost.com/business/economy/a-guide-to-the-financial-crisis--10-years-later/2018/09/10/114b76ba-af10-11e8-a20b-5f4f84429666_story.html). By the end of June 2009, close to 240,000 families in New York were past due on their mortgages, and families living within the state were expected to lose close to $242 billion dollars in home equity (Center for Responsible Lending, *Financial Crisis in New York and the Need for a Consumer Financial Protection Agency* [September 2009], *available at* https://www.responsiblelending.org/mortgage-lending/policy-legislation/states/ny-statewide.pdf). The collapse of the economy also led to record-level unemployment in New York and nationally (*see* New York Department of Labor, *Employment in New York State* [Feb 2010], *available at* https://labor.ny.gov/stats/PDFs/enys0210.pdf; Christopher J. Goodman & Steven M. Mance, *Employment loss and the 2007-09 recession: an overview*,

Monthly Labor Review, Apr. 2011, at 4-8). Workers in New York and other states experienced mounting job losses which led to significantly diminished tax revenue and a reduction in available funds for social services and education (Raymond H. Brescia & Nicholas Martin, *The Price of Crisis: Eminent Domain, Local Governments, and the Value of Underwater Mortgages*, 24 Temp Pol & Civ Rts L Rev 1, 12 [2014]). Homeowners began to abandon their underwater properties, which then "demanded extensive city resources in the form of police and fire services[,]" adding to the costs faced by flailing municipalities (Sarah L. Swan, *Plaintiff Cities*, 71 Vand L Rev 1227, 1239-1240 [2018]).

The Federal Reserve estimated that the loss in real estate wealth per US household was roughly $30,300, and the loss in stock wealth per household was approximately $66,200 (Pew Research Center, *The Impact of the September 2008 Economic Collapse* [Apr. 28, 2010], https://www.pewtrusts.org/en/research-and-analysis/reports/2010/04/28/the-impact-of-the-september-2008-economic-collapse). As these numbers suggest, unsurprisingly, the Great Recession's effects skewed towards the most vulnerable members of our society (McCluskey, 22 Berkeley La Raza LJ at 24). While homeowners did not receive government assistance to cope with their losses, "the government allocated $700 billion of taxpayer funds to provide relief to troubled banks and Wall Street investment firms—the largest bailout of private financial companies in American history" (Tracie R. Porter, *Pawns for A Higher Greed: The Banking and Financial Services Industry's Capture of Federal Homeownership Policy and the Impact on Citizen Homeowners*, 37 Hamline L Rev 139, 174 [2014]). In addition to the individual

suffering caused by the financial crisis, the country lost an estimated $648 billion in revenue "due to slower economic growth" (Pew Research Center, *The Impact of the September 2008 Economic Collapse* [Apr. 28, 2010], https://www.pewtrusts.org/en/research-and-analysis/reports/2010/04/28/the-impact-of-the-september-2008-economic-collapse).

Unsurprisingly, the financial crisis led to litigation by various financial-sector entities and investors seeking to recover their losses due to the devaluation of securitized, subprime mortgages. Typically, in these cases, the trustee of an RMBS trust or a certificate holder who invested in the securities alleges breaches of the representations and warranties commonly made in the industry as part of an RMBS transaction.

The litigation has been robust. For example, our Court has decided seven appeals dealing with alleged breaches of representations and warranties in RMBS cases in the last five years. We have held, among other things, that an RMBS breach of contract claim accrues on the date that defendant made the allegedly false representations and warranties (*ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc.*, 25 NY3d 581, 594-595 [2015]), that attempts to delay the commencement of the statutory limitations periods are against New York public policy (*Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. Natl.*, 32 NY3d 139, 143 [2018]), and that, as a matter of contract interpretation, plaintiffs can only recover through damages limitation provisions for breaches of loan-specific representations and warranties (*Nomura*, 30 NY3d at 577; *Ambac Assur. Corp. v Countrywide Home Loans, Inc.*, 31 NY3d 569, 581 [2018]). It is no exaggeration to say that litigation will continue for the foreseeable future, given the

creativity of counsel and the vast amount of money at stake. Whether this litigation will discourage repetition of the sins of the past and avoid another economic meltdown depends, at least in part, on how we apply the law governing contractual remedies.

B. The Morgan Stanley ABS Capital I Inc, Trust 2007-NC4 and the Trustee's Breach of Contract Litigation

The current appeal is the latest New York installment in the RMBS saga. This time the plaintiff before us proceeds under a theory of gross negligence for alleged breaches of representations and warranties concerning the value and stability of the RMBS securitization sold to Morgan Stanley ABS Capital I Inc, Trust 2007-NC4 (the Trust)—a transaction plaintiff calls "the Deal."

In 2007, Morgan Stanley Capital Inc. (MSCI) purchased 5,337 mortgage loans at a public auction after the loan originator went bankrupt. MSCI claimed to have reviewed the loan-origination files, including the borrowers' applications, before purchasing the loans. Defendant Morgan Stanley Capital Holdings LLC (MS Holdings), as successor-by-merger to MSCI, sold the loans to its affiliate, defendant Morgan Stanley ABS Capital I, Inc. (MS ABS)[1] through a Representations and Warranties Agreement (RWA). MS ABS, as depositor for the Deal, entered into a Pooling Services Agreement (PSA) with plaintiff

---

[1] MS Holdings is a limited liability company formed under New York law, and MS ABS is a corporation formed under Delaware law. Both MS Holdings and MS ABS are wholly owned subsidiaries of Morgan Stanley, which is a publicly held corporation.

Deutsche Bank National Trust Company (the Trustee).[2] The mortgage loans were conveyed to the Trust, which was created under the PSA.

The Trust issued certificates representing a security interest in the loans to Morgan Stanley, and Morgan Stanley sold the certificates to investors. Morgan Stanley profited from the sale of the certificates to the public and received approximately half a million dollars as an underwriting fee in connection with the RMBS transaction.

Defendants made representations regarding the quality of the loans in the RWA,[3] and defendant MS ABS made additional representations that it had good title to the mortgage loans when it transferred them to the Trust. The RWA representations were incorporated into the PSA. Defendants made similar representations in the public offering documents, including assertions that their due diligence to ensure the quality of the loans met underwriting guidelines before loans were sold to the Trust.

Under both agreements, if a mortgage in the Trust was in breach of a representation or warranty that materially and adversely affected the value of the loan or the interests of the Trustee or a certificateholder, defendants were obligated to cure, repurchase the loan at

---

[2] Deutsche Bank National Trust Company is a national banking association organized to carry out the business of a limited-purpose trust company under the laws of the United States. Deutsche Bank National Trust Company is a wholly owned subsidiary of a chain of subsidiaries owned by Deutsche Bank AG, which is a publicly held banking corporation organized under the laws of the Federal Republic of Germany.

[3] For example, defendants represented that "[t]he information set forth in the" agreements "relating to the [m]ortgage [l]oans" was "complete, true and correct as of" the transaction's cut-off date; unless already identified, none of the loans within the pool were more than 30 days' delinquent; the mortgaged properties were insured; all charges relating to the properties had been paid; and none of the mortgagors were "encouraged or required" to obtain subprime mortgages.

a defined price, or substitute the defective loan.[4] This "sole remedy" provision is common in securitization transactions (*see generally, ACE Sec. Corp.*, 25 NY3d 581; *Nomura*, 30 NY3d 572; *Ambac Assur. Corp.*, 31 NY3d 569; *Flagstar Capital Markets Corp.*, 32 NY3d 139).

Plaintiff commenced this action in its capacity as Trustee against defendants, charging that the mortgage loans were higher risk than defendants had publicly represented. The complaint alleges widespread breaches of the representations and warranties and the defendants' refusal to cure or repurchase the defective loans. According to plaintiff, these breaches resulted in the Trust losing almost half a billion dollars in value, approximately 50% of the original loan balance.

Plaintiff alleges that this was no mere mistake but, rather, that the sponsor and depositor transferred the loans fully aware that they were misleading plaintiff and certificateholders as to the value of the securitization. In support of this claim, the complaint asserts that in 2011, the certificate insurer, which issued an insurance policy for the certificateholders' benefit, retained a third-party consultant to analyze a sample of at least 800 mortgages held in the Trust. The consultant discovered that every one of the examined mortgages violated the warranties and representations in the PSA and RWA. The

---

[4] The PSA defined the repurchase price as "an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of the repurchase, (ii) interest on such unpaid principal balance[,]" (iii) "all unreimbursed Servicing Advances," (iv) "all costs and expenses incurred by" plaintiff "arising out of or based upon a breach or defect, including without limitation, costs and expenses relating to" plaintiff's "enforcement of the repurchase obligation . . . under the" RWA, and (v) "any costs and damages incurred by the Trust in connection with any violation" of predatory or abusive lending laws. The RWA incorporated this definition by reference.

breaches involved key characteristics of the mortgages, including misrepresentations in the mortgage applications concerning the borrowers' incomes, debt obligations, and employment, and the properties' occupancy and values. Plaintiff alleges that this number of breaches is unprecedented.

Plaintiff attached to the complaint a Securities and Exchange Commission (SEC) Order issued in 2014 instituting Cease and Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933.[5] According to that order, and as described in plaintiff's complaint, the SEC concluded that the defendants' acts "[o]perated or [w]ould [o]perate as a [f]raud or [d]eceit [u]pon [p]urchasers[.]"[6] The SEC explained,

> "[t]he transactions, which were the last subprime RMBS [that respondents] sponsored, issued, and underwrote, came against the backdrop of rising borrower delinquencies and unprecedented distress in the subprime market. In the midst of these adverse market conditions, [respondents] misrepresented in the offering documents the current or historical delinquency status of certain loans collateralizing the transactions."

The SEC found that, while the RWA and PSA guaranteed that no more than 1% of the loans in the Trust were delinquent at the time that the loans were transferred to the Trust, defendants knew or should have known that "at least 4.5%" of the Trust's aggregate principal balance was delinquent immediately before the transfer. The SEC concluded that defendants' conduct leading to "offering documents that materially understated [then]

---

[5] Respondents in the Cease and Desist Proceedings included a third Morgan Stanley subsidiary, Morgan Stanley and Co. LLC, in addition to the two defendants in this case.
[6] The SEC Order addressed defendants' misleading public disclosures regarding delinquent loans in the Trust at issue in this appeal and a second subprime RMBS transaction concluded the same year, 2007.

current delinquencies" violated Securities Act of 1933 Sections 17 (a) (2)-(3) (prohibiting [1] the offer or sale of securities for compensation by means of any untrue statement of a material fact or any omission of a material fact and [2] transactions, practices, or courses of business that operate or would operate as a fraud or deceit upon the purchaser). The SEC ordered that defendants cease and desist from committing or causing any current or future violations and pay disgorgement, interest, and civil penalties totaling over a quarter million dollars.

The complaint alleges that accurate representations and warranties "were especially important to the Deal because the party" that "originated the Mortgage Loans [] was bankrupt and could not guarantee the Loans. The [d]efendants' representation[s] and [their] notice and cure or repurchase obligations were thus the only ways to ensure for the Trust that the Mortgage Loans would be of sufficient quality to fund the bargained-for cash flow to the Certificateholders." With respect to delinquency rates, the SEC similarly noted in its order that "[t]he presence and extent of current and historical delinquencies is important information to investors because it helps enable them to assess the likelihood that borrowers will be able to repay their mortgage loans and, as a result, whether investors will suffer losses on, or will recover profit from, their investments." Indeed, the SEC found that defendants' misrepresentations of the loan delinquency rates caused millions of dollars in losses to investors from bankruptcies, properties reverting to lenders and foreclosures.

Plaintiff further alleges that, given the large number of breaching loans, the defendants' repurchase obligation could not fulfill its "essential purpose" of ensuring that

the Trust received the "economic benefit" of its bargain with defendants. Thus plaintiff was "entitled to alternative remedies, including an award of damages."

As relevant to this appeal, based on its factual allegations, plaintiff requested compensatory damages in lieu of the specific performance provided for in the PSA and RWA, along with punitive damages and attorneys' fees. Supreme Court granted in part defendants' motion to dismiss the cause of action for breach of representations and warranties, under CPLR 3211 (a) (1) and (7), finding that plaintiff failed to allege conduct that rises to gross negligence that would, among other things, support relief from the sole remedy provision. The Appellate Division reversed, concluding that the complaint sufficiently pleads that the sole remedy provision is unenforceable as a matter of public policy, given defendants' alleged gross negligence and because the court could not determine at the pleading stage whether the sole remedy provision would "mak[e] the investors whole" (*Matter of Part 60 Put-Back Litig.*, 169 AD3d 217, 225 [1st Dept 2019]). The Court further held that the alleged wrongdoing supported plaintiff's demand for punitive damages, and that defendants had conceded attorneys' fees under First Department precedent (*id.* at 226, citing *U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 140 AD3d 518 [1st Dept 2016]). The Appellate Division granted defendants leave to appeal.

I agree for the reasons stated by the majority that plaintiff is not entitled to attorneys' fees and reversal on that issue is warranted (majority op at 17-18). I would otherwise affirm the Appellate Division as to plaintiff's demand for relief because the complaint adequately pleads gross negligence by defendants for which plaintiff may seek compensatory and punitive damages not limited by the sole remedy provision. I first address the new rule

adopted in this appeal and then turn to the duty of care question left unanswered by the majority.

## II.

### Standard of Review

"On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction" (*Leon v Martinez*, 84 NY2d 83, 87 [1994]). "We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*id.* at 87-88; *accord AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 591 [2005]; *Rushaid v Pictet & Cie*, 28 NY3d 316, 327 [2016]). The motion to dismiss "must be denied if from the pleadings' four corners 'factual allegations are discerned which taken together manifest any cause of action cognizable at law'" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 152 [2002], quoting *Polonetsky v Better Homes Depot*, 97 NY2d 46, 54 [2001]; *accord Rushaid v Pictet & Cie*, 28 NY3d 316, 327 [2016]; *JF Capital Advisors, LLC v Lightstone Group, LLC*, 25 NY3d 759, 764 [2015]; *see also Maddicks v Big City Props., LLC*, 34 NY3d 116, 125 [2019]). "A copy of any writing which is attached to a pleading is a part thereof for all purposes" (CPLR 3014; *accord 805 Third Ave. Co. v M.W. Realty Assoc.*, 58 NY2d 447, 451 [1983]). "The form of the complaint and the label[s]" used"by the pleader are not to be exalted to a position of control" (*Alvord & Swift v Muller Const. Co.*, 46 NY2d 276, 284 [1978]). The relevant inquiry is whether a cause of action exists, "not whether the plaintiff[] properly

labeled or artfully stated one" (*Chanko v American Broadcasting Cos. Inc.*, 27 NY3d 46, 52 [2016]).

Notably, whether the plaintiff "can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). Put another way, our task is to discern whether a cause of action is viable, not whether the plaintiff will ultimately prevail (*Leon*, 84 NY2d at 88).

Dismissal under CPLR 3211 (a) (1) is warranted "only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law" (*Leon*, 84 NY2d at 88). That is, the documentary evidence must "conclusively refute[] plaintiff's" allegations (*AG Capital Funding Partners, L.P*, 5 NY3d at 591).

III.

Plaintiff Sufficiently Pleads Claims for Compensatory Damages for Gross Negligence
Not Limited by the Sole Remedy Provision

Defendants do not allege that the complaint fails to plead a cause of action for breach of contract based on gross negligence. Nor could they, as the complaint describes alleged intentional misrepresentations that led to widespread financial loss for the Trust and certificateholders, even as defendants collected fees for services intended to provide accurate information regarding the quality and marketable title of the mortgage loans. Instead, defendants assert that, as a matter of law, plaintiff may not seek compensatory or punitive damages for its alleged misconduct. Specifically, defendants maintain that the sole

remedy provision is plaintiff's only source of relief for the alleged breaches of the RWA and PSA.

Plaintiff responds that the provision is unenforceable given defendants' gross negligence and alleges that repurchase alone cannot compensate the Trust for losses due to the massive devaluation of the mortgage loans. As I discuss, precedent and public policy support plaintiff's argument.

A. The Gross Negligence Exception to Contractual Limitations on Damages

There is no dispute that parties are free to enter agreements that further their respective interests, so long as they do not violate public policy (*Trustees of Columbia Univ. in City of New York*, No. 40, 2020 NY Slip Op 06937, at *3 n 4). As the majority correctly states, a party cannot escape liability for gross negligence by means of an exculpatory or nominal damages clause, since such limitations violate public policy (majority op at 6-7, citing *Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d 821, 823 [1993], citing *Sommer*, 79 NY2d at 554; *Kalisch-Jarcho, Inc.*, 58 NY2d at 384-385; and *Gross*, 49 NY2d at 106). The majority also correctly holds that, to invoke this public policy exception, a plaintiff need not establish an independent tort or duty of care separate from the parties' contractual relationship (majority op at 7-8, citing *Abacus Fed. Sav. Bank*, 18 NY3d at 684-85).

The majority errs, however, when it concludes that, where no separate duty of care has been violated, the exception only applies to exculpatory or nominal damages clauses. In other words, according to the majority, any agreed upon remedy forecloses claims for

additional relief, regardless of whether the damages limitation compensates plaintiff or discourages gross negligence. The majority's reasoning for constricting our public-policy-based rule is unpersuasive as an abstract proposition and irrelevant here, where plaintiff has alleged defendants' violation of a separate duty of care not to mislead the public about the defects in the mortgage loans, especially the delinquency rates.

B. The Sole Remedies Provision is an Unenforceable Limitation on Defendants' Liability for Grossly Negligent Conduct

The Court has previously addressed the public policy exception in cases involving exculpatory and nominal damages clauses, but that does not mean, as the majority concludes, that the exception only applies to those two categories of limiting clauses. The public policy that justifies the exception remains vital even when, as here, the parties agree to damages that are not nominal, but which the injured party alleges fail to compensate for gross negligence. The breaching party's defining conduct—gross negligence—remains the same, regardless of the damages limitation, as does the public interest in discouraging recklessness.

This Court first recognized the gross negligence exception in *Gross v Sweet* (49 NY2d 102 [1979]). In that case, the plaintiff sued the owner and a training school where he took a parachute jumping course for damages (*id.* at 105). As a prerequisite for admission into the course, the plaintiff signed a release form that exculpated the defendants from any personal injury or property damage incurred during the course (*id.*). On the first day, the plaintiff jumped from an airplane and suffered serious personal injuries (*id.*). In

filing suit, the plaintiff claimed that the defendants "failed to provide adequate training and safe equipment, violated certain rules and procedures promulgated by the Federal Aviation Administration governing the conduct of parachute jumping schools and failed to warn [the plaintiff] sufficiently of the attendant dangers" (*id.*). The defendants countered that the release insulated them from all tort liability no matter how negligent they had been (*id.*)

The issue before this Court in *Gross* was straightforward: could the defendants shield themselves from the consequences of their negligence by means of a liability waiver? The Court analyzed the waiver's enforceability, beginning "with the proposition, too well settled to invoke in any dispute, that the law frowns upon contracts intended to exculpate a party from the consequences of [their] own negligence" (*id.* at 106). The Court then noted that, "[t]o the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts they have been viewed as wholly void" (*id.*).

Several years later, the Court stated "[m]ore pointedly" that "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing" and "betokens a reckless indifference to the rights of others" (*Kalisch-Jarcho, Inc.*, 58 NY2d at 385).

*Sommer* further expounded upon the principle articulated in *Gross*. The plaintiff in *Sommer* owned a skyscraper in midtown Manhattan and contracted with the defendant to monitor a fire alarm system installed in the building (79 NY2d at 548). A confused employee of the defendant negligently deactivated the alarm system, leading to a fire that raged through one floor of plaintiff's building, causing $7 million worth of damages to the

property (*id.* at 549). The plaintiff accused defendant of gross negligence and sought damages for the fire (*id.*). The defendant invoked a provision in its contract with the plaintiff that limited its liability for negligence to $250 (*id.*). This Court held that the damages limitation was unenforceable as against public policy (*id.* at 553).

In *Abacus*, this Court noted that "exculpatory clauses and liquidated damages clauses in contracts are not enforceable against allegations of gross negligence" (18 NY3d at 683). The majority discounts as dictum this Court's statement in *Abacus* that the exception applies to "liquidated damages[,]"—i.e., stipulated damages agreed to by the parties (majority op at 8 n 5). Yet, the majority fails to explain why this is an incorrect statement of law. Indeed, we have never held that a liquidated damages or specific performance provision is enforceable, even if it effects the same purpose as a nominal damages clause and effectively insulates a defendant from accountability for gross negligence or reckless misconduct. Rather, the majority elides the question by marginalizing the *Abacus* Court's reference to both exculpatory clauses and damage limitations that provide for more than a nominal sum (*see* 18 NY3d at 683). Thus, the majority makes way for its new rule that the gross-negligence exception applies only to exculpatory and nominal damages clauses.

But the majority is not even fully committed to this rule and does not put it to the test here. The majority asserts that the provision "was intended to make the Trust whole" (majority op at 12)—meaning that, in the majority's view, the remedy is reasonable. Indeed, as the majority quotes, "[a] total immunity clause is bad; a limitation provision, *if*

*reasonable,* is not" (majority op at 10 [emphasis added], citing 15 Williston on Contracts § 1750A, 147 quoting *Soviero Bros. Contr. Corp. v City of New York*, 286 App Div 435, 441 [1st Dept 1955], *affd without op* 2 NY2d 924 [1957]). This is exactly right. Here, plaintiff alleges the limitation is not reasonable given the widespread nature of the breaches and the defendants' recklessly broken promises about the quality of the mortgage loans, as illustrated by the certificate insurer's findings regarding the 800-loan sample and the SEC order. The factual allegations of gross misconduct—which we must accept as true—are sufficient and thus plaintiff's claim for damages beyond those provided by the sole remedy provision survives the motion to dismiss (*Leon*, 84 NY2d at 87; *511 W. 232nd Owners Corp.*, 98 NY2d at 152).

As this discussion illustrates, our case law stands for the proposition that courts will not stamp their imprimatur on a remedy that fails to hold a defendant accountable for harm that it has caused through gross negligence, including harm that threatens catastrophic consequences and implicates the public interest. Usually, courts act to further the welfare of the parties to a contract, for they are ordinarily the only parties affected by the contract. If, however, the performance of the contract threatens or causes harm external to the contracting parties and thus exceeds the value of the contract, then courts must take into consideration those actual or potential harms (Steven Shavell, *Foundations of Economic Analysis of Law* 294, 320 [2004]; Ronald H. Coase, *The Firm, The Market, And The Law* 27-28 [1990]). Put another way, it should never be worth the risk to a contracting party (especially a bank) to perform and thus breach a contract in a grossly negligent manner, where the costs of grossly negligent performance far surpass the gains from breach

(Richard Posner, *Economic Analysis of Law* 616-620 [8th ed 2011] [detailing the incentives that existed for banks to securitize subprime mortgages and the extensive harm caused by their doing so excessively]). Moreover, the law should eliminate incentives for a contracting party to spread false information about its products and services, as lack of transparency constitutes a market failure (Francis M. Bator, *The Anatomy of Market Failure*, 72 QJ Econ 351, 354 [1958] [describing market failure as a result of legal and organizational imperfections which leave "inputs or outputs hidden"]; Allan Buchanan, *Ethics, Efficiency, and the Market* 19-20 [1985] [describing how lack of information and false information undermines markets' efficiency]).

"The rationale behind" the public policy exception "is that the risk of harm to the public increases when contracting parties exempt themselves from liability for their intentional or reckless conduct" (*American Motorist Ins. Co. v Morris Goldman Real Estate Corp.*, 277 F Supp 2d 304, 307 [SDNY 2003]). If the public policy exception does not apply because damages are capped at some non-nominal sum, the number of cases in which grossly negligent breaches appear to contracting parties to be worth the risk that they pose increases, and so does the potential, uninternalized threat to the public. Put another way, the public policy exception exists to disincentivize intentional wrongdoing and recklessness that threatens the public by providing a remedy commensurate with the harm done.

By way of example, assume that the damages provision in *Sommer* allowed the plaintiff to recover 10% of the loss caused through the defendant's negligence instead of $250. Arguably the plaintiff's recovery of $700,000—10% of the $7 million worth of

damages that the defendant's negligence caused—is not nominal. But the remedy fails to compensate for the other 90% of the injury and, if the value of the contract exceeds the cost of breach to the fire alarm company, the remedy does nothing to promote the public's interest in discouraging grossly negligent breaches of contract, which, in the case of *Sommer*, was a conflagration that could have spread throughout the plaintiff's building or to another building, endangering lives and causing further property damage.

Gross negligence, given its extreme nature, also poses a foreseeability issue for non-breaching parties. Arguably, even a sophisticated entity, like plaintiff here, will not anticipate conduct in "contravention of acceptable notions of morality" or that "smacks of intentional wrongdoing" and "betokens a reckless indifference to the rights of others" (*Kalisch-Jarcho, Inc.*, 58 NY2d at 385). Indeed, who would contract with a party one anticipates acting in that way? Thus, limited damages provisions, which are designed to address foreseeable breaches, cannot be said to accommodate gross negligence.

The appeal before us demonstrates that point. Assume the limitations on recovery accepted by the majority, including that the agreements' plain language does not shift attorneys' fees—the same reading I give to these documents (majority op at 17-18). It defies logic and common sense that a contracting party in plaintiff-Trustee's position would enter into the agreements at issue here anticipating that the sponsor or depositor would knowingly ignore accepted underwriting practices leading to sweeping breaches— perhaps reaching 100% of the loan pool if the certificate insurer's sampling is indicative of the breaches' extent—and then shift onto itself the burden of defendants' gross negligence

by agreeing to litigate each breach under the sole remedy provision on a case-by-case basis without attorneys' fees.[7]

Granted, the replace-and-repurchase sole remedy provision makes sense in the abstract, when parties assume, because of the representations made in the RMBS materials, that the defective mortgage loans are small in number and have limited impact on the value of the Trust as a whole. In that case, the individualized loan approach is workable and provides a fair remedy for the type of loan deficiencies commonplace in the market. In contrast, the sole remedy provision is wholly inappropriate when the Trustee and investors are unaware that the Trust is populated with a supermajority of subprime mortgages with little chance of providing a meaningful rate of return on investment. In that type of RMBS transaction, the actual risk level is hidden; and because of the concentration of delinquent subprime mortgage loans, the RMBS cannot sufficiently dilute the risk, negating the investor's primary justification for buying an interest in an RMBS.

Why then does the majority adopt a rule that disserves nonbreaching parties and the public? As the majority concedes, limitations on liability are subject to judicial scrutiny and may be nullified on public policy grounds (majority op at 7-8). Nevertheless, the majority concludes that the public interest in deterring gross negligence has no place where

---

[7] The majority's argument that the sole remedy is not illusory because liquidated damages are available in this case because of defendant's concessions misses the mark (majority op at 13). First, the rule announced by the majority applies beyond these parties. Second, it is unclear whether plaintiff may pursue relief by the use of sampling. If not, the sole remedy provision may indeed be illusory and fail to provide plaintiff with the benefit of its bargain.

the parties are litigating a breach limited to their bargain. This analysis is grounded in outdated notions of legal doctrine.

We are long past the heyday of the *Lochner* era where every type of contractual agreement was tolerated under the banner of "freedom of contract" (*see* David A. Strauss, *Why Was Lochner Wrong?*, 70 U Chi L Rev 373, 383-386 [2003] [describing the shortcomings of unnuanced freedom of contract as articulated by courts in the *Lochner* era]; *see generally* Joseph W. Singer, *Things That We Would Like to Take for Granted: Minimum Standards for the Legal Framework of a Free and Democratic Society*, 2 Harv L & Poly. Rev 139 [2008] [arguing that market regulations and some limits on freedom of contract are necessary]). Under modern notions of contract law, there is no logical or just basis for enforcing an unreasonable and harm-facilitating damages provision simply because it provides more than nominal relief. Yes, parties are free to adopt a damages provision intended to address a possible breach (*Trustees of Columbia Univ. in City of New York*, No. 40, 2020 NY Slip Op 06937, at *1-2). But such provisions are unenforceable if the recovery that they allow is excessive *or* unreasonably small, or, as plaintiff alleges here, fails to achieve its essential purpose (*id.* at *3-4; Restatement [Second] of Contracts § 195[1]; NYUCC § 2-719, official comment 1; *Wilson Trading Corp*, 23 NY2d at 404-405). In other words, limitations on damages are upheld only if they are reasonable in light of the harm caused through breach.

Thus, whether the gross negligence exception applies, rendering the sole remedy provision unenforceable—as I argue, or the provision is assessed for reasonableness under

general rules of contract, defendants' legal argument fails, as does this branch of the motion to dismiss.


C. Claims of Gross Negligence Based on Defendants' Independent Duty of Care

Even accepting the majority view that, with respect to cases solely grounded in breach of contract, the public policy exception applies exclusively to exculpatory or nominal damages clauses, that still leaves open the application of the exception to cases that "fall[] in the borderland between tort and contract" where a plaintiff alleges an independent duty of care (*Sommer*, 79 NY2d at 550). In those cases, "the lines of distinction are shadowy and obscure, and the tort and the contract so approach each other, and become so nearly coincident as to make their practical separation somewhat difficult" (*id.* at 550-551, quoting *Rich v New York Cent. & Hudson Riv. R.R. Co.,* 87 NY 382, 390 [1882] [internal quotation marks omitted]; and *citing Matter of Paver & Wildfoerster [Catholic High School Assn.]*, 38 NY2d 669, 678 [1976]; Prosser, Selected Topics on the Law of Torts, ch VII, *The Borderland of Tort and Contract* [1953]; Note, *The Elastic Concept of Tort and Contract as Applied by the Courts of New York*, 14 Brooklyn L Rev 196 [1948]). In at least some borderland cases, like in *Sommer*, the "relationship" formed through contract "gives rise to a duty of reasonable care that is independent" of the parties' "contractual obligations" (*id.* at 553).

Here, plaintiff alleges that defendants violated federal securities law by publishing statements intended to mislead the public about the deficiency rates of the subprime mortgage loans sold to the Trust, citing the SEC investigation and Order. As the SEC

articulated, defendants had a duty to comply with the Securities Act of 1933, passed in the wake of the Great Depression, which regulates the creation and sale of securities by requiring robust disclosures that accrue to the benefit of, not only the parties to a securities transaction, but the public generally (*see* HR Rep 85, 73d Cong, 1st Sess 1-2 [1933] [noting the abuses and harm to the public that prompted the creation of securities disclosure requirements, and the President and Legislature's intent "to protect the public"]). This regulatory regime embodies an axiom, championed by Justice Louis D. Brandeis, that "[s]unlight is said to be the best of disinfectants: electric light the most efficient policeman" (Louis D. Brandeis, Other People's Money And How The Bankers Use It 62 [1914]).

In *Sommer*, the Court concluded that the plaintiff's claims against that defendant sounded in contract and tort, explaining that the defendant's "duty to act with reasonable care is not only a function of its private contract with [the plaintiff] but also stems from the nature of its services" (79 NY2d at 552). In *Sommer*, the defendant's fire alarm transmittal services were subject to New York's fire-safety regulations, which this Court interpreted as the expression of a public interest in the defendant providing its services with reasonable care. Similarly, in *Gross*, the plaintiff indicated the defendants' violation of Federal Aviation Administration regulations in making his claim for gross negligence (49 NY2d at 105).

In accordance with our liberal pleading standards, we assume all facts asserted in the complaint to be true and draw all reasonable inferences from those assertions, with full recognition that form and labels do not control (*Leon*, 84 NY2d at 87-88). Under that well-established standard, and contrary to the majority's conclusion, plaintiff adequately alleges

conduct giving rise to separate liability in tort, as the Court has previously understood that concept. Plaintiff claims that defendants' "widespread breaches . . . demonstrate that the defendants' were grossly negligent in their performance of (and failure to perform) their contractual obligations." This gross negligence stems, in part, from numerous "misrepresentations to the public." Defendants' securities transactions are regulated to ensure the public is not misled nor capital markets compromised (*see, e.g.*, Securities Act of 1933 Sections 17 [a] [2] & [3]; Securities Exchange Act of 1934 Sections 12 [b], 12 [g], & 15 [d]; 17 CFR229.1100 [b]; 17 CFR229.1111 [a] [3], [a] [5], & [c]; 26 USC §§ 860a-g). Certainly, the public interest in transparent RMBS markets, avoiding economic catastrophe, and imposing the full cost of gross negligence on financial institutions that sell securities and perform services like those at issue here is immense, as illustrated by the Great Recession and the regulatory regime that governs securitization. Thus, as reflected in the regulatory scheme, defendants had a duty of reasonable care to the investing public and plaintiff independent of the RMBS agreements.

Apparently, the majority believes a fire-alarm company violates public policy by contracting to limit its liability for property damage from an out-of-control building fire, but an RMBS sponsor and depositor can cabin damages for alleged gross negligence that sparked a financial meltdown and threw the country into a historic recession. To be sure, the devastating effects of a building fire on property or a parachute training school's use of faulty equipment or training procedures on individual lives are beyond cavil. But so too were the "catastrophic consequences" of the global economic crisis, the effects of which

were felt acutely in New York, the home of Wall Street and the financial capital of the United States.

## IV.

## Plaintiff Sufficiently Pleads a Claim for Punitive Damages

"[P]unitive damages may be recoverable if necessary to vindicate a public right" and "are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations'" (*New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 315-316 [1995]).

The specific pleading requirements for a punitive damage claim in a breach of contract action are well established and not in dispute. First, "defendant's conduct must be actionable as an independent tort" (*New York Univ.*, 87 NY2d at 316). For the reasons I have discussed, the complaint alleges services which "gives rise to a duty of reasonable care that is independent of [defendants'] contractual obligations" (*Sommer*, 79 NY2d at 553). Thus, plaintiff has met the first requirement.

Second, the tortious conduct must be egregious (*New York Univ.*, 87 NY2d at 316). This requirement is satisfied by plaintiff's allegations of intentional wrongdoing that led to a securitization of mortgage loans substantially in breach of the contracts' representations and warranties. The complaint alleges that defendants knowingly made false

representations about the quality and good title of the Trust's mortgage loans: "[d]efendants' conduct forms part of a pattern by which [they] freely misrepresented, to the public, RMBS as good investments in order to pad their own bottom lines." The complaint further alleges that the SEC imposed close to a quarter billion dollars of sanctions on defendants for violations of the Securities Act of 1933 based on defendants' misleading public disclosures regarding the delinquency rates of mortgage loans in the Trust. Further, as the certificate insurer's investigation revealed, 100% of a sample of 800 loans were in breach, and the SEC concluded that at least 4.5% of the loans were delinquent when they were transferred to the Trust.

Third, the conduct must be directed at the plaintiff (*id.*). It is a closer call whether plaintiff has sufficiently pleaded this element, given that potential investors are the obvious targets of the alleged misinformation and suffered devaluation in their investments. However, plaintiff alleges that defendants' misconduct was directed at both certificateholders and the Trustee. Plaintiff argues that defendants' scheme could not have succeeded without first misrepresenting the quality of the mortgage loans to the Trustee, which purchased and held the loans in the Trust. As plaintiff made clear in the PSA, its "policy and intention . . . was to acquire only [m]ortgage [l]oans meeting the requirements set forth in" its agreement with defendant. I cannot conclude that plaintiff's pleading fails at this stage given those assertions. Therefore, these allegations satisfy the third pleading requirement.

Fourth, and finally, the conduct must be part of a pattern directed at the public generally (*id.*). Plaintiff alleges defendants intentionally misled the public through its disclosure documents and intentionally ignored the known high-delinquency rates of the mortgage loans so that they could collect substantial fees. According to plaintiff, defendants either failed to diligently examine the quality of the mortgage loans or intentionally ignored the loans' defects. Indeed, the complaint states that one judge noted defendants' "wholesale abandonment of underwriting standards and protocols." These alleged widespread breaches of the representations and warranties bespeak of an underlying pattern of gross negligence. Therefore, the allegations that defendants intentionally misrepresented the quality and title of the mortgage loans to induce purchase of the loans and to collect fees for defendants' services easily satisfy this last requirement.

## V.

It may be that plaintiff will not prevail on its claim, notwithstanding the SEC Order and the results of the 800-loan sample. But that is not our concern in this appeal. We must simply decide whether, at this stage of litigation, plaintiff has sufficiently alleged a claim based on gross negligence and, if so, whether plaintiff may seek damages beyond those permitted by the sole-remedy provision. As to the first question, the complaint makes out a claim that survives the motion to dismiss. The second question raises broader issues as to the public's interest in holding defendants accountable if plaintiff proves gross negligence by virtue of defendants' intentional failure to conduct their RMBS transaction with reasonable care. We have seen the dire effects on investors and society generally when

financial institutions ignore protocols adopted to avoid the type of malfeasance alleged by plaintiff. Our State's public policy does not allow parties to contract around restraints on conduct that risk taking the economy over a cliff.

In sum, for the reasons I have discussed, plaintiff adequately pleads a basis for its compensatory and punitive damages demand, and to that extent I would affirm the Appellate Division.

Order reversed, with costs, order of Supreme Court, New York County, reinstated and certified question answered in the negative. Opinion by Judge Fahey. Judges Stein, Wilson and Feinman concur. Judge Rivera dissents in part in an opinion. Chief Judge DiFiore and Judge Garcia took no part.

Decided December 22, 2020