*319 OPINION OF THE COURT
Rivera, J.
Plaintiffs challenge the dismissal of their claims for lack of personal jurisdiction, alleging defendants’ business activities bring them within the reach of New York’s long-arm statute. We conclude that defendants’ intentional and repeated use of New York correspondent bank accounts to launder their customers’ illegally obtained funds constitutes purposeful transaction of business substantially related to plaintiffs’ claims, thus conferring personal jurisdiction within the meaning of CPLR 302 (a) (1). Accordingly, the Appellate Division order should be reversed and the matter remitted to Supreme Court for consideration of defendants’ alternative grounds for dismissal of the amended complaint.
I. Background
Plaintiff Rasheed A1 Rushaid is a Saudi resident and co-owner of plaintiff A1 Rushaid Petroleum Investment Corpora *320 tion (ARPIC), a company organized under the laws of Saudi Arabia, and the owner of another Saudi company, plaintiff A1 Rushaid Parker Drilling, Ltd. (ARPD). Defendants are Pictet & Cie (Pictet), a private bank with its principal place of business in Geneva, Switzerland, Vice-President and Client Relationship Manager Pierre-Alain Chambaz and Pictet’s eight general partners.[1] Plaintiffs sued defendants in New York state court for concealing ill-gotten money from a scheme orchestrated by three of plaintiffs’ employees.
As alleged in the first amended complaint, ARPD contracted to build six oil rigs for Saudi Arabia’s national oil company. Unbeknownst to the plaintiffs, three ARPD employees responsible for procuring services and vendors for the project breached their fiduciary responsibilities by accepting bribes and kickbacks from certain vendors, in exchange for purchasing products at inflated prices and ignoring deficiencies in the vendors’ services.[2]
Defendants played a central role in the employees’ scheme by knowingly laundering and concealing the bribes and kickbacks for approximately four years. According to the amended complaint, “the corrupted employees needed the help of a willing banker, a role fulfilled by Defendants Pictet and Chambaz.” Specifically, Chambaz set up an offshore “bogus” company to receive the bribes—TSJ Engineering Consulting Co. Ltd. (TSJ) in the British Virgin Islands. He opened and actively managed Geneva-based Pictet bank accounts for TSJ and the individual employees. The bank orchestrated the laundering of funds from the vendors who wired bribes in favor of “Pictet and Co. Bankers Geneva” to Pictet’s New York correspondent bank account.[3] From there, the funds were credited by Pictet to TSJ’s Geneva-based account, and the money was *321 later divided up and transferred to the employees’ individual accounts.
Plaintiffs alleged that “Pictet and Chambaz valued their cozy business relationship with the corrupted employees more than they valued proper banking procedures, or ensuring that it complied with its own financial responsibilities.” As described in the amended complaint, Chambaz was no innocent banker. He was friends with the employees, and one of them—a friend for over 30 years—emailed Chambaz about TSJ’s name and requested that Chambaz “add the co. to make it appear to be okay.” Chambaz also knew the employees’ annual income and that they worked full time as officers or directors for ARPD. Thus, he had information that the money being deposited vastly exceeded the employees’ pay and was the result of some breach of their duties, but he continued to help the employees conceal the scheme.
Plaintiffs asserted that defendants aided and abetted the employees’ breach of their fiduciary duty and were part of a civil conspiracy with the employees. Plaintiffs sought over $350 million in damages for harm incurred as a result of the bribery and kickback scheme and the consequent financial devastation of their business.
Defendants moved to dismiss the amended complaint under CPLR 3211 (a) for lack of personal jurisdiction and failure to state a claim, and pursuant to CPLR 327 on the basis of forum non conveniens. Defendants also moved to dismiss as against A1 Rushaid and ARPIC for lack of standing under CPLR 3211 (a) (2).
In opposition to the motion, plaintiffs submitted copies of TSJ’s articles of association and other corporate documents listing the employees as owners and sole shareholders, and applications for TSJ’s and the employees’ Pictet bank accounts. Plaintiffs also submitted copies of documents tracing wire transfers from the vendors to Pictet’s five New York correspondent accounts, which the complaint alleged were credited to TSJ’s and the employees’ Pictet Geneva accounts. The documents provide a record of invoices directing payment to Pictet’s Citibank account in New York, “credit advice” documents *322 reflecting payment to that same account, and routing documents tracing transfers again through that same New York account. Plaintiffs also submitted similar documents evidencing receipts from and transfers to various other Pictet accounts in New York including HSBC Bank USA, N.A., Deutsche Bank Trust Company, America, and JPMorgan Chase Bank N.A. In sum, the documents represented numerous transfers, including at least 12 of which were to/from Citibank, New York and totaled over $4 million.
Supreme Court granted defendants’ motion to dismiss for lack of personal jurisdiction, concluding that defendants’ use of the correspondent accounts was passive not purposeful (2014 NY Slip Op 32286 [U] [Sup Ct, NY County 2014]). The court also denied jurisdictional discovery based on a statement by plaintiffs’ counsel at oral argument that the request was their fallback argument. In light of its decision, the court did not address defendants’ alternative grounds for dismissal.
Plaintiffs appealed, arguing that personal jurisdiction existed under the reasoning of Licci v Lebanese Can. Bank, SAL (20 NY3d 327 [2012]). The Appellate Division affirmed, and distinguished Lied as requiring deliberate acts which were absent in plaintiffs’ case because the defendants merely carried out their clients’ instructions and did not “purposefully avail [ ] [themselves] of the privilege of conducting activities in New York” (127 AD3d 610, 611 [1st Dept 2015]). We granted leave to appeal (26 NY3d 909 [2015]).
II. New York’s Long-Arm Statute CPLR 302 (a) (1)
Plaintiffs allege that Pictet’s repeated use of New York correspondent accounts to receive and transfer millions of dollars in illicit funds was central to the kickback and bribery scheme, and constitutes the transaction of business substantially related to their claims against defendants sufficient to confer personal jurisdiction under CPLR 302 (a) (1). Defendants respond that personal jurisdiction cannot depend on third-party conduct, and requires a type of purposeful availment by defendants that is lacking here. Defendants also counter that the bank deposits are incidental to the claimed wrongdoing because the basis for the lawsuit is defendants’ role in conspiring and aiding and abetting the concealment of the bribes, not the manner in which the funds were allegedly concealed.
We conclude that defendants’ use of the correspondent bank accounts was purposeful and that plaintiffs’ aiding and abetting and conspiracy claims arise from these transactions. Our *323 decision is in accord with the analysis in Lied, that the requirements of CPLR 302 (a) (1) are satisfied where the quantity and quality of contacts establish a “course of dealing” with New York, and the transaction and claim are not “merely coincidental” (see Licci, 20 NY3d at 339-340).
A. Transacting Business in New York through a Correspondent Account
CPLR 302 (a) (1) of New York’s long-arm statute provides, in relevant part,
“As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . .
“transacts any business within the state or contracts anywhere to supply goods or services in the state.”
The CPLR 302 (a) (1) jurisdictional inquiry is twofold: under the first prong the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the claims must arise from the transactions.[4] Thus, “jurisdiction is proper even though the defendant never enters New York, so long as the defendant’s activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted” (Fischbarg v Doucet, 9 NY3d 375, 380 [2007] [internal quotation marks omitted]).
The Court has explained that “[p]urposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws” (id. [citations omitted]). Determining “ ‘purposeful availment’ is an objective inquiry, [which] always requires a court to closely examine the defendant’s contacts for their quality” (Licci, 20 NY3d at 338, citing Fischbarg, 9 NY3d at 380).
*324 In Amigo Foods Corp. v Marine Midland Bank-N.Y. (39 NY2d 391 [1976]), the Court considered whether a non-domiciliary’s use of a New York-based correspondent bank provides a jurisdictional basis under CPLR 302 (a) (1). In that case, plaintiff Amigo Foods Corporation, a New York wholesaler, contracted to buy potatoes from a Maine potato grower. Payment was to be made by letter of credit at or through defendant Aroostook Trust Company, a bank located in Maine. Amigo Foods obtained the letter of credit from New York-based Marine Midland Bank, which delivered the letter to Aroostook’s New York correspondent bank, Irving Trust Company. The parties disputed the nature of the relationship between Aroostook and Irving Trust, and relied on competing legal theories as to whether Irving Trust was an agent or an independent contractor of Aroostook. On appeal from dismissal of the complaint for lack of jurisdiction, this Court reversed and remanded for jurisdictional discovery, concluding that Aroostook’s involvement needed to be clarified because, “standing by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under CPLR 302 (subd [a], par 1)” (39 NY2d at 396).
On remand, discovery revealed that Amigo Foods directed Marine Midland Bank to wire funds to the wholesaler’s account with Aroostook. Marine Midland unilaterally chose to wire payment through the “relatively small checking account” defendant maintained at Irving Trust (Amigo Foods Corp. v Marine Midland Bank-N.Y., 61 AD2d 896, 897 [1st Dept 1978]). When Aroostook informed the Maine potato grower of this transaction, the potato grower instructed Aroostook to reject the funds, which it did. The Appellate Division dismissed for lack of jurisdiction because Aroostook, through its New York correspondent account, had “passively and unilaterally been made the recipient of funds” (61 AD2d at 897). We affirmed for the reasons stated (Amigo Foods Corp. v Marine Midland Bank-N.Y., 46 NY2d 855 [1979]).
Years later the Court revisited the issue of correspondent accounts as a basis for personal jurisdiction in Lied. In that case the Second Circuit certified two questions regarding the application of CPLR 302 (a) (1) to a foreign bank charged with violations of the Anti-Terrorism Act, Alien Tort Statute, and Israeli tort law. In Licci, several dozen United States, Canadian, and Israeli citizens were injured by terrorist attacks in *325 Israel launched by Hizballah. The plaintiffs sued Lebanese Canadian Bank (LCB) for facilitating terrorist acts by providing banking services to Hizballah. Personal jurisdiction in New York was alleged based on LCB’s use of a New York correspondent bank account to effectuate the wire transfers that provided the funds to Hizballah’s “financial arm,” the Shahid Foundation, necessary to the commission of the illegal attacks (20 NY3d at 331).
In addressing the certified questions, our Court stated that
“[i]n the banking context, the requisite inquiry under CPLR 302 (a) (l)’s first prong [the transacting business requirement] may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States” (20 NY3d at 338).
To clarify, the Court relied on Amigo Foods as an example of activity that cannot serve as a basis for personal jurisdiction because Aroostook’s use of the correspondent account “was essentially adventitious—i.e., it was not even Aroostook’s doing” (Licci, 20 NY3d at 338). This Court did not reason, contrary to the dissent’s suggestion (dissenting op at 341), that personal jurisdiction arising from the use of a correspondent bank account in New York must also be accompanied by additional activities in the state. Instead, Lied held that
“complaints alleging a foreign bank’s repeated use of a correspondent account in New York on behalf of a client—in effect, a ‘course of dealing’ . . .— show purposeful availment of New York’s dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States” (Licci, 20 NY3d at 339, citing Indosuez Intl. Fin. v National Reserve Bank, 98 NY2d 238, 247 [2002]).
The case cited by the Court in support of this “course of dealing” formulation, Indosuez Intl. Fin. v National Reserve Bank (98 NY2d 238 [2002]), involved 14 currency exchange transactions between a Netherlands corporation and a Russian bank, six of which were made by the plaintiff to a New York bank and 10 of which had New York choice of law provisions. *326 Personal jurisdiction existed because the parties had established payment in five prior similar transactions through a New York bank, by which “a course of dealing ha[d] been established” (98 NY2d at 247, citing Banco Ambrosiano v Artoc Bank & Trust, 62 NY2d 65, 72-73 [1984] [finding sufficient contacts to maintain jurisdiction where defendant maintained a correspondent bank account in New York, the account was “the very account through which” the transaction at issue was effectuated, and the defendant “regularly” used the account to “accomplish its international banking business”] ,[5] and Parex Bank v Russian Sav. Bank, 116 F Supp 2d 415, 422 [SD NY 2000] [finding a Russian company “does business” in New York where it “routinely” conducted exchange deals and agreed to accept payment and a security deposit using New York banks and banking institutions]).
Given this understanding of the first prong of CPLR 302 (a) (1), the Court in Lied concluded that the repeated use by LCB of the correspondent account showed a transaction of business where LCB “deliberately used a New York account again and again” and “[presumably” LCB used this New York account because it was “cheaper and easier for LCB than other options” (20 NY3d at 340). Thus, even though “LCB could have routed the dollar transactions on behalf of Shahid elsewhere, the fact that LCB used a New York account ‘dozens’ of times indicates desirability and a lack of coincidence” (20 NY3d at 340).
As these cases establish, unintended and unapproved use of a correspondent bank account, where the non-domiciliary bank is a passive and unilateral recipient of funds later rejected—as in Amigo Foods—does not constitute purposeful availment for *327 personal jurisdiction under CPLR 302 (a) (1). Repeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer—as in Lied—demonstrates volitional activity constituting transaction of business. In other words, the quantity and quality of a foreign bank’s contacts with the correspondent bank must demonstrate more than banking by happenstance.
Turning to plaintiffs’ appeal, we first assume as true the facts alleged in the amended complaint because, “[o]n a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction. We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory” (Leon v Martinez, 84 NY2d 83, 87-88 [1994] [citation omitted]). The Court may “consider affidavits submitted by plaintiffs to remedy any defects in the complaint, because the question is whether plaintiffs have a cause of action, not whether they have properly labeled or artfully stated one” (Chanko v American Broadcasting Cos. Inc., 27 NY3d 46, 52 [2016]).
The amended complaint asserts that Pictet maintained a relationship with New York banks and marketed “business relations in New York” on its website. Specifically, the Citibank, New York account was used to wire the bribes to a Pictet account in Geneva, after which point, the money was divided up and distributed amongst the “corrupted employees” by deposit to their individual Pictet accounts. Chambaz knew the large sums of money being wired were proceeds of an illegal scheme but never questioned them, and continued to aid and abet the fraud. In opposition to the motion to dismiss, plaintiffs submitted copies documenting 12 wire transfers to Citibank in favor of TSJ, from 2006-2008, which reveal the movement of millions of dollars from the vendors to the employees. Similar transactions were documented from several other of Pictet’s New York correspondent accounts.
After the vendors sent the money to Citibank, Pictet did not ignore or reject the funds, as the defendant did in Amigo Foods (39 NY2d 391). Rather, Pictet credited the funds in that correspondent bank account to TSJ, an essential step in the money-laundering scheme. Citibank and the other banks held funds for Pictet, then Pictet credited them to the TSJ account, and next distributed the funds to the employee accounts. It is of no moment that the employees “directed the vendors” to *328 deposit the money in the New York accounts because what matters is defendants’ banking activity with the correspondent accounts, here, that the money deposited in New York was credited to the Pictet accounts in accordance with Pictet’s money-laundering. As described in the complaint, the employees accessed the funds in those accounts after Pictet credited the transfer from its New York correspondent account.
The Appellate Division erroneously concluded that plaintiffs failed to establish purposeful availment because defendants “merely carried out their clients’ instructions” (127 AD3d at 611). Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them. Contrary to the dissent’s assertion (dissenting op at 341), in Lied, it was Hizballah that directed the wire transfers through LCB’s correspondent bank and not defendant, LCB. A foreign bank with a correspondent account, therefore, that repeatedly approves deposits and the movement of funds through that account for the benefit of its customer is no less “transacting business in New York” because the customer, or a third party at the customer’s direction, actually deposits or transfers the funds to New York.
Moreover, the jurisdictional inquiry at the first prong requires a close examination of defendant’s contacts (Licci, 20 NY3d at 338). If those contacts are enough, the fact that others may also have contact with the correspondent bank is not dispositive. The facts here illustrate the point because the complaint alleges that defendants orchestrated the money laundering and that the New York account was integral to the scheme. It is precisely the fact that defendants chose New York, when other jurisdictions were available, that makes the New York connection “volitional” and not “coincidental.” The focus of the jurisdictional analysis is the foreign bank’s conduct vis-a-vis the correspondent bank, meaning how it uses the correspondent accounts—not whether, some other bank could have been used instead.
Defendants’ use of the correspondent accounts is far from the “unilateral” payment in Amigo Foods where plaintiffs chose to deposit money in New York at their own discretion because here the vendors’ choice to deposit money in New York was precisely part of defendants’ design, and not a “unilateral” decision at all. Pictet was therefore actively engaged in a cycle of banking transactions wherein money went from the vendors to New York to Geneva, and then from Geneva to the employees. *329 The use of the account was not “adventitious” because the account was used routinely to hold deposits which Pictet then credited to TSJ’s account in Geneva. Thus, the correspondent account was crucial to a course of repeated banking activity.
Defendants’ conduct is like that found sufficient in Licci, where the defendants actively used a correspondent bank to further a scheme that caused harm. As in Licci, the defendants’ use of the New York account to transfer money provided the employees with the “laundered” profits from the bribery and kickback scheme. Also, just as in Licci, defendants used the correspondent account in New York “to move the necessary” money (Licci, 20 NY3d at 340).
Defendants’ correspondent banking activity is sufficient to establish a purposeful course of dealing, constituting the transaction of business in New York under CPLR 302 (a) (1).
B. Cause of Action Arising from the Contacts with New York
To satisfy the second prong of CPLR 302 (a) (1) that the cause of action arise from the contacts with New York, there must be an “ ‘articulable nexus’ ... or ‘substantial relationship’ . . . between the business transaction and the claim asserted” {Licci, 20 NY3d at 339). This inquiry is “relatively permissive” (id. at 339, citing McGowan v Smith, 52 NY2d 268 [1981], and Kreutter v McFadden Oil Corp., 71 NY2d 460 [1988]), and does not require causation, but merely “a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim” (Licci, 20 NY3d at 339). The claim need only be “in some way arguably connected to the transaction” {id. at 340).
The allegations in the complaint easily satisfy this nexus requirement. Plaintiffs allege that defendants aided and abetted in the employees’ breach of their fiduciary duty to the plaintiffs, and defendants further conspired with each other and the employees by acting in concert to breach fiduciary duties, defraud plaintiffs, and convert plaintiffs’ property. These claims depend on the assertions that defendants established the banking structure in New York and Geneva through which they orchestrated the money laundering part of the bribery/ kickback scheme. Defendants served as the employees’ bankers, without whom the employees could not launder and conceal millions in kickbacks and bribes. In Licci, the Court found the requisite nexus where the bank effected wire transfers which *330 financed terrorist activities. Similarly, the complaint alleges that Pictet and defendants effected the transfers of money to the New York correspondent bank as part of the money-laundering scheme that put the bribes/kickbacks in the hands of the employees. Those allegations are enough to show the minimum level of relatedness to the Citibank transactions.
Defendants argue that the use of the New York correspondent bank is not substantially related to the allegations because the transfers occurred months after TSJ and the individual Pictet bank accounts were created, and therefore the transfers were incidental to the scheme that injured the plaintiffs, since the injury would exist had payment been made by means other than wire transfers. Defendants mistakenly rely on Johnson v Ward (4 NY3d 516 [2005]) in support of their argument that the New York connection was “merely coincidental.” In Johnson, a nonresident driver, with a New York state license and registration, got into a car accident from which a tort claim arose. The accident occurred in New Jersey and all the parties were New Jersey residents. The Court reasoned that the possession of a New York license and registration at the time of the accident was “merely coincidental” because the claim arose out of the allegedly negligent driving, not the issuance of a New York license and registration (id. at 520). The defendant driver could have had a license from elsewhere or no license at all.
Here, the money laundering could not proceed without the use of the correspondent bank account, and, as plaintiffs argue, their claims require proof that the bribes and kickbacks were in fact paid. The money laundering scheme Chambaz designed relied precisely on the existence of bank accounts in different jurisdictions, through which the money would pass. In Johnson, the claim of negligence was wholly separate from defendant’s possession of a New York State license and registration. In contrast, plaintiffs’ claims of aiding and abetting breaches of fiduciary duties and conspiracy turn entirely on the money laundering Pictet and Chambaz allegedly set up and maintained, necessarily including the use of a New York bank account.
III. Federal Constitutional Due Process
Exercise of personal jurisdiction under the long-arm statute must comport with federal constitutional due process requirements (LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 216 [2000]). *331 It is well established that a nondomiciliary must have “certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice” (International Shoe Co. v Washington, 326 US 310, 316 [1945] [internal quotation marks and citations omitted]). As the Second Circuit has aptly noted, “despite the fact that section 302(a)(1) . . . and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare” (Licci ex rel. Licci v Lebanese Can. Bank, SAL, 732 F3d 161, 170 [2d Cir 2013]). This is not such a case, and defendants’ arguments to the contrary are meritless.
The “minimum contacts” test “has come to rest on whether a defendant’s conduct and connection with the forum State are such that it should reasonably anticipate being haled into court there” (LaMarca, 95 NY2d at 216 [internal quotation marks and citations omitted]). Such minimum contacts exist where a defendant “purposefully avails itself of the privilege of conducting activities within the forum State” (id.). Here, defendants’ maintenance and repeated use of a New York correspondent bank account “to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry” (Licci ex rel. Licci, 732 F3d at 173).
Whether personal jurisdiction offends “notions of fair play and substantial justice” depends on a consideration of “the burden on the defendant, the forum State’s interest in adjudicating the dispute, the plaintiff’s interest in obtaining convenient and effective relief, the interstate judicial system’s interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies” (Burger King Corp. v Rudzewicz, 471 US 462, 477 [1985]). Here, while the parties are foreign nationals, the burden of litigation in New York is reduced by “modern communication and transportation” (Licci ex rel. Licci, 732 F3d at 174 [citations omitted]). Furthermore, the complaint implicates the fraudulent use of New York’s banking system, an issue of great importance to the State, and New York courts provide the plaintiffs a greater possibility of relief. On balance, and considering all the remaining factors, the maintenance of suit here does not “offend traditional notions of fair play and substantial justice.”
*332 IV. Forum Non Conveniens
Defendants advance another alternative argument, that we should dismiss the complaint on forum non conveniens grounds as a matter of law. We find no support for this position. “In general, a decision to grant or deny a motion to dismiss on forum non conveniens grounds is addressed to a court’s discretion, and we will review it only to decide whether discretion has been abused” (Mashreqbank PSC v Ahmed Hamad Al Gosaibi & Bros. Co., 23 NY3d 129, 137-138 [2014]). Such cases, where dismissal on forum non conveniens grounds is required as a matter of law, are “relatively uncommon” (id.). “The doctrine is flexible, requiring the balancing of many factors in light of the facts and circumstances of the particular case” (National Bank & Trust Co. of N. Am. v Banco De Vizcaya, 72 NY2d 1005, 1007 [1988]). The instant appeal is a poor candidate for forum non conveniens disposition in this Court because there has been no discovery and plaintiffs allege the existence of additional contacts that may affect the balance of factors in favor of maintaining jurisdiction over the case. Instead, Supreme Court should address the matter in the first instance.
V
Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

. The general partner defendants are Philippe Bertherat, Rémy Antoine Best, Renaud Fernand de Planta, Jacques Joseph de Saussure, Bertrand Francois Lambert Demole, Jean-Francois Demole, Marc Philippe Pictet, and Nicolas Luden Pictet.

. Plaintiffs alleged that once they discovered the bribes they commenced an action in Switzerland, through which they successfully froze TSJ Engineering Consulting Co. Ltd.’s and the employees’ Pictet accounts. Also, the employees were indicted in Switzerland for money laundering.

. The complaint alleges that Chambaz and Pictet knew the money was “the result of some breach of the corrupted employees’ duties,” “provide [d] . . . substantial help,” “hid” millions of dollars in kickbacks, set up “a ‘bogus’ company to receive the bribes,” “also set up and managed Pictet bank accounts that were used by the corrupted employees to launder and conceal the bribe money,” knew that TSJ would be used to launder money, and “helped *321 the corrupted employees open bank accounts” that would be used to receive the laundered money, all in violation of their own fiduciary duties. Thus, contrary to the dissent’s assertion (dissenting op at 342), the plaintiffs allege that Pictet and Chambaz designed and orchestrated the scheme.

. Notably,
“[t]he tran.sacting-bu.sin.ess requirement of N.Y. C.P.L.R. 302 requires far fewer contacts with New York than does the doing-business requirement of N.Y. C.P.L.R. 301. Indeed, proof of one transaction in New York is sufficient to invoke jurisdiction. This easing of requirements is offset by the corresponding requirement that the cause of action arise from the very transaction or transactions which are relied upon to provide the contact with the forum” (15 NY Jur 2d, Business Relationships § 1159).

. The dissent’s apparent concern over our reference to these cases is misplaced. The Court in Lied cites both Indosuez (Licci, 20 NY3d at 339) and Banco Ambrosiano (id. at 335) to support its analysis of when the use of a correspondent account rises to the level of a “course of dealing.” Further, the dissent incorrectly insists that Indosuez is inapplicable because jurisdiction hinged on the New York forum selection clauses and the fact that the bank was itself a party to the contract. The forum selection clauses were only an alternative ground for jurisdiction, not a necessary component of it (Indosuez, 98 NY2d at 247). Additionally, it is true that the bank was a party to the contracts at issue, but nowhere does the Court rely on this fact in its personal jurisdiction analysis. The dissent’s attempt to distinguish Banco Ambrosiano is similarly unpersuasive. Not only did Indosuez cite Banco Am-brosiano in the context of defining a course of dealing, but Lied also cited Banco Ambrosiano as an example of this Court’s consideration of when a party may be subject to jurisdiction based on the use of a correspondent bank account, albeit in a different context.