# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 2
State of New York,
      Appellant,
    v.
Vayu, Inc.,
      Respondent.

Dustin J. Brockner, for appellant.
Respondent precluded.

GARCIA, J.:

Defendant Vayu, Inc., a Delaware corporation headquartered in Michigan that designs and manufactures unmanned aerial vehicles, sold two UAVs to the State University of New York at Stony Brook for delivery in Madagascar. Following a dispute regarding

- 1 -

the operability of the UAVs, plaintiff State of New York commenced this action on behalf of SUNY Stony Brook, asserting, among other claims, breach of contract (*see* Executive Law *§ 63 [1]*).[1]  Vayu moved to dismiss the complaint for lack of personal jurisdiction and plaintiff opposed, asserting that the trial court had jurisdiction over Vayu pursuant to New York's long-arm statute, CPLR 302 (a) (1).  That statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state."  Supreme Court granted Vayu's motion and a divided Appellate Division affirmed.  We now reverse.

When assessing whether there is personal jurisdiction over a defendant pursuant to the "transacts any business" clause of New York's long-arm statute, courts must ask "whether *what the defendant did in New York* constitutes a sufficient 'transaction' to satisfy the statute" (David D. Siegel & Patrick M. Connors, New York Practice § 86 [6th ed, Dec 2022 Update] [emphasis added]).  Examination of a defendant's actions in New York is primarily a fact-based inquiry that requires an assessment of whether the non-domiciliary's activities in the state were purposeful (*see Paterno v Laser Spine Inst.*, 24 NY3d 370, 376 [2014]).  "Purposeful activities," this Court has explained, are "volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws' " (*id.*, quoting *Fischbarg v*

---

[1] SUNY Stony Brook is a public university located in Stony Brook, New York (*see* Education Law § 352 [3]).

*Doucet*, 9 NY3d 375, 380 [2007]).  "[A]lthough determining what facts constitute 'purposeful availment' is an objective inquiry, it always requires a court to closely examine the defendant's contacts for their quality" (*Licci v Lebanese Can. Bank, SAL*, 20 NY3d 327, 338 [2012]).  We conclude that Vayu's actions, outlined below, were purposeful and amounted to the transaction of business within this State.

In 2013, Vayu's Chief Executive Officer, Daniel Pepper, contacted Dr. Peter Small, who was not yet affiliated with SUNY Stony Brook, about using UAVs to transport laboratory samples.  It is unclear whether Small was in New York at the time.  Two years later, in 2015, while working as a professor of medicine and director of the Global Health Institute at SUNY Stony Brook, Small contacted Pepper seeking a business relationship between Vayu and SUNY Stony Brook for the development and use of UAVs to deliver medical supplies to remote areas in underdeveloped countries.  From 2015 through 2017, Pepper communicated with Small and other representatives of SUNY Stony Brook through telephone calls to SUNY Stony Brook phone numbers, emails to SUNY Stony Brook email addresses, and later through a face-to-face meeting in New York.  These discussions concerned both the development of UAVs to be sold to SUNY Stony Brook, as well as broader partnership opportunities.  In the summer of 2016, Vayu and SUNY Stony Brook worked together to submit a grant application to the United States Agency for International Development (USAID), in which Vayu described SUNY Stony Brook as a "partner" and identified Small as a key member of its "team."  The submission also outlined a two-year budget with SUNY Stony Brook receiving approximately $85,000 per year for costs such

as travel, stipends, and technical support as part of an effort to supply 10 UAVs to Madagascar. USAID ultimately approved the grant proposal that included these representations.

In September 2016, SUNY Stony Brook purchased two UAVs from Vayu for $25,000 each. Vayu sent an invoice to SUNY Stony Brook at a post office box located in New York, and Vayu accepted a wire payment from SUNY Stony Brook that originated in New York. Attached to the invoice was a note from a Vayu employee stating "[w]e can discuss down the line whether [Small] would like these shipped to NY, or on [SUNY Stony Brook's] behalf to Madagascar." The drones were later shipped directly to Madagascar from Michigan. By November 2016, however, problems arose with the operation of the two UAVs. Vayu employees and SUNY Stony Brook representatives attempted to resolve the issues by telephone and email, and in September 2017, Pepper offered to meet Small in New York. At that meeting, Pepper and Small agreed to terms for moving forward, which were memorialized via email: SUNY Stony Brook would bear the cost of shipping the UAVs from Madagascar to Michigan; Vayu would provide replacement UAVs that met SUNY Stony Brook's specifications; and Vayu would train one of SUNY Stony Brook's employees to operate the UAVs. The two parties also discussed an ongoing business relationship and future opportunities between Vayu and SUNY Stony Brook. In November 2017, SUNY Stony Brook returned the two UAVs to Vayu in Michigan. Vayu failed to replace them or provide a refund.

These facts demonstrate a clear intent by Vayu to engage purposefully in business activities within the meaning of CPLR 302 (a) (1). For two years, Vayu projected itself into the State via calls and emails with Small and others at SUNY Stony Brook that resulted in the sale of two UAVs.[2] The content of the communications here show that Vayu purposefully sought to establish a substantial ongoing business relationship with SUNY Stony Brook (*see Fischbarg*, 9 NY3d at 382-383). Long-arm jurisdiction is appropriately exercised over commercial actors who have, as Vayu did here, " 'us[ed] electronic and telephonic means to project themselves into New York to conduct business transactions' " (*Paterno*, 24 NY3d at 376, quoting *Deutsche Bank Sec., Inc. v Montana Bd. of Investments*, 7 NY3d 65, 71 [2006] [collecting cases]). And, although being physically present in New York is not required (*see id.*), the fact that Pepper traveled to New York to meet with Small in furtherance of the ongoing business relationship is significant.

In granting Vayu's motion to dismiss, Supreme Court emphasized that it was Small at SUNY Stony Brook who reached out to Pepper for the purpose of creating the business relationship at issue and described later communications between Vayu and representatives of SUNY Stony Brook as "predominantly responsive in nature." Similarly, the Appellate Division majority concluded that the relationship was a single transaction that occurred after Small began work at SUNY Stony Brook and contacted Vayu's CEO (*State of New York v Vayu, Inc.*, 195 AD3d 1337, 1340 [3d Dept 2021]). The court opined that it was

---

[2] Our dissenting colleague's view that New York lacks status as a "commercial hub for drone purchases" (dissenting op at 7) is not relevant to the jurisdictional inquiry.

"undisputed that the parties formed a relationship," but nevertheless characterized the communications between the parties as only "discuss[ing] the ongoing issues" related to the UAVs which did not result in more sales in New York or "seek to advance defendant's business contacts in New York" (*id*. at 1339-1340, citing *Paterno*, 24 NY3d at 378). The reasoning of both courts is inconsistent with the record and our precedent.

We have noted that " 'CPLR 302 is a single-act statute requiring but one transaction—albeit a purposeful transaction—to confer jurisdiction in New York' " (*Parke-Bernet Galleries, Inc. v Franklyn*, 26 NY2d 13, 17 [1970], quoting Joseph McLaughlin, Supplementary Practice Commentary to CPLR 302, McKinney's Cons. Laws of N.Y, Book 7B [1969 Cum Supp], at 129-130; *see Deutsche Bank Sec.*, 7 NY3d at 71). In any event, the communications here relate not only to the sale of the two drones, but also to a continuing business relationship between Vayu and SUNY Stony Brook (*see George Reiner & Co., Inc. v Schwartz*, 41 NY2d 648, 653 [1977]). Moreover, this is not a case where plaintiff responded to a "passive website[]" (*see Paterno*, 24 NY3d at 377), but rather involved an active dialogue between principals based on earlier personal contact. And, although a defendant's initiation of contact with New York is a relevant factor in the purposeful availment analysis, it is not determinative (*see Grimaldi v Guinn*, 72 AD3d 37, 51 [2d Dept 2010] ["(I)t is not necessarily who initiated contact that is determinative, but rather, the nature and quality of the contacts and the relationship established as a result"]). Moreover, contrary to the dissent's characterization of this arrangement as a unilateral "plan" conceived by Small (dissenting op at 5), the email communications between the two

make clear that Pepper reached out to Small in December 2013 to discuss "the idea to use drones to transport lab samples." According to Pepper, that idea was "a shared vision" between the two, specifically for "an affordable and autonomous, long-range . . . delivery drone that can address the needs of 'last mile' rural healthcare delivery." The sale of the drones to SUNY Stony Brook for use in Madagascar furthered this shared vision.

The Appellate Division majority also discounted the meeting in New York because "[t]he visit by the CEO to New York in 2017 was for the purpose of discussing issues regarding the *completed* purchase of the UAVs, rather than seeking additional business from SUNY Stony Brook or other entities in New York" (195 AD3d at 1340 [emphasis in original]). This conclusion was also incorrect. Although at the time of the 2017 meeting in New York, SUNY Stony Brook had already accepted delivery of the allegedly defective UAVs, that meeting led to modification of the agreement, including the agreement to replace the drones. In its cause of action for breach of contract, plaintiff alleged that, after acknowledging the defects in the drones, defendant breached the terms governing replacement. The circumstances here, involving actions undertaken pursuant to an ongoing business relationship, are distinguishable from those in *Paterno*, where the alleged tort— malpractice based on a medical procedure performed by defendant in Florida—had already taken place prior to certain contacts plaintiff claimed established the requisite relationship with New York (24 NY3d at 379).

We have made clear that "the nature and purpose of a solitary business meeting conducted for a single day in New York may supply the minimum contacts necessary to

subject a nonresident participant to the jurisdiction of our courts" (*Presidential Realty Corp. v Michael Sq. W., Ltd.,* 44 NY2d 672, 673 [1978]). Here, however, there was more than this bare minimum: the meeting was part of a far reaching and long-standing relationship (*see e.g. Stardust Dance Productions, Ltd. v Cruise Groups Intl., Inc.*, 63 AD3d 1262, 1264 [3d Dept 2009]). The parties had a two-year business relationship when the principals met—at Pepper's request—in New York in 2017. In the weeks that followed, the parties exchanged emails and calls, including an email from Pepper to Small memorializing the modified terms of the agreement with an assurance that "above all else, we want to figure out a solution and work together." The meeting in New York, and the follow up communications, "designedly and materially forwarded the negotiation and performance of the contract for sale" of the UAVs (*Dulman v Potomac Baking Co.*, 85 AD2d 676, 677 [2d Dept 1981]).

The second prong of New York's long-arm statute, requiring the cause of action to arise from a defendant's relevant business transaction in the state, is easily met. Plaintiff's claims are based on the sale of the two UAVs, and Vayu's contacts in New York were directly related to efforts to resolve the dispute over operability of the purchased UAVs (*see Vayu*, 195 AD3d at 1342 [Egan Jr., J., dissenting]). Thus, "[t]here is an articulable nexus or substantial relationship between defendant's New York activities and the parties' contract, defendant's alleged breach thereof, and potential damages" (*D & R Glob. Selections, S.L. v Bodega Olegario Falcon Pineiro*, 29 NY3d 292, 299 [2017]).

Finally, the exercise of jurisdiction must also comport with due process, a constitutional inquiry focused on "the relationship among the defendant, the forum, and the litigation" (*Williams v Beemiller, Inc.*, 33 NY3d 523, 529 [2019] [internal quotations omitted]). "[D]ue process requires first that a defendant have minimum contacts with the forum state such that the defendant should reasonably anticipate being haled into court there and second, that the prospect of having to defend a suit in New York comports with traditional notions of fair play and substantial justice" (*D & R Glob. Selections,* 29 NY3d at 300 [internal citations omitted]). Jurisdiction will be upheld where the defendant purposefully reaches beyond their State into another but "the relationship between defendant and the forum state must arise out of defendant's own contacts with the forum and not 'contacts between the plaintiff (or third parties) and the forum State' " (*Beemiller*, 33 NY3d at 529, quoting *Walden v Fiore*, 571 US 277, 284 [2014]).

Those requirements are satisfied here. Vayu sought, negotiated, and then entered a contractual relationship with a New York State entity. Vayu furthered that relationship through numerous telephonic and email communications with SUNY Stony Brook and continued negotiations over terms of the deal when Vayu's CEO visited New York and met with Small in 2017. Vayu's 2016 grant application to USAID, describing SUNY Stony Brook as a "partner" and projecting a two-year budget for SUNY Stony Brook's costs related to delivery of an additional 10 UAVs, further demonstrates Vayu's understanding of this relationship with SUNY Stony Brook as ongoing and connected to New York. In

these circumstances, Vayu should reasonably have anticipated being haled into court here (*see World-Wide Volkswagen Corp. v Woodson*, 444 US 286, 297 [1980]).

The dissent misconstrues the nature of the agreement between the parties and, as a result, misapplies our law. The voluminous contacts between Vayu and SUNY Stony Brook over a two-year period were not merely "responsive in nature" (dissenting op at 7), but rather ongoing negotiations over the original terms and subsequent modification of a contractual relationship. The dissent also mischaracterizes the meeting in New York, which was not simply to "assuage" concerns (dissenting op at 2, 11[describing the visit as discussing "complaints"]), but to modify the terms of their agreement and discuss ongoing collaboration. In fact, the new terms agreed upon are at issue in this lawsuit (*see Martin v Peyton*, 246 NY 213, 218 [1927] ["An existing contract may be modified later by subsequent agreement, oral or written"]). Likewise, the refrain that the drones, which were intended for use in SUNY Stony Brook's initiative to provide health solutions in developing countries, were for the "benefit and use of [Madagascar's] people" (dissenting op at 2, 15 [drones were designed to "serv[e] the needs of non-New Yorkers"]), confuses the concept of potential third-party beneficiaries of a commercial agreement with the long-arm jurisdictional inquiry into defendant's activities in New York (*see e.g. Fourth Ocean Putnam Corp. v Interstate Wrecking Co*., 66 NY2d 38, 45 [1985] [discussing third-party beneficiary rights to enforce a contract]). And, of course, the fact that persons located in remote areas of Madagascar might benefit from delivery of much-needed medical supplies by SUNY Stony Brook's drones does not mean that SUNY Stony Brook itself would reap

no benefit from the success of the program; success may well have enhanced the program's reputation and made it possible for SUNY Stony Brook to expand the program to service other populations in need.[3]

Accordingly, the order of the Appellate Division should be reversed, with costs, and Vayu's CPLR 3211 (a) (8) motion to dismiss the complaint denied.

---

[3] Moreover, the dissent appears to conflate the requirements of CPLR 302 (a) (1): the defendant must *either* "transact[] any business within the state *or* contract[] anywhere to supply goods or services in the state" (emphasis added). The fact that the drones were sent "directly from the factory floor to Madagascar" (dissenting op at 15) would certainly preclude any claim by plaintiff pursuant to the "supply goods" in the state prong of CPLR 302, which we can assume is why plaintiff did not assert that basis for personal jurisdiction here.

RIVERA, J. (dissenting):

Plaintiff's employee—a professor at Stony Brook University and the director of its Global Health Institute—contacted defendant's Michigan-based chief executive officer to purchase two unmanned aerial vehicles, commonly known as "drones," to be delivered

- 1 -

directly from Michigan to the Republic of Madagascar off the eastern coast of Africa. They negotiated the contract terms and design specifications by telephone and email and finalized the contract remotely. After delivery, the parties discovered that the drones were defective. The CEO and some of defendant's other employees went to Madagascar to troubleshoot the issues and attempt to bring the drones up to plaintiff's standards. At one point, the CEO came to New York to assuage the professor's concerns and attempt to repair their relationship. Originally, the CEO and the professor had also planned to collaborate on future projects, but after their dealings with the defective drones, they parted ways and plaintiff commenced this lawsuit for damages incurred under the contract.

These contacts are insufficient under CPLR 302 (a) (1) to establish that this commercial, non-domiciliary defendant transacted business within New York State such that it could be subjected to personal jurisdiction in our state courts. The parties' discussions about, and preliminary steps toward, establishing a potential but unconsummated future business relationship does not alter the analysis because this lawsuit was based on a contract formed outside of New York for products manufactured in Michigan and sent directly to Madagascar for the benefit and use of its people. This section of our long arm statute applies to those who *transact business within* New York and not to those, like defendant, who happen to conduct some business with a party located in New York. In my view, the majority adopts an overly broad reading and unconstitutional extension of CPLR 302 (a) (1). Therefore, I dissent.

## I.

### A.

"The ultimate burden of proving a basis for personal jurisdiction rests with the party asserting jurisdiction" (*Fanelli v Latman*, 202 AD3d 758, 759 [2d Dept 2022], citing *Fischbarg v Doucet*, 9 NY3d 375, 381 n 5 [2007], and *Aybar v Aybar*, 169 AD3d 137, 142 [2d Dept 2019], *affd* 37 NY3d 274 [2021]). Thus, where a defendant, as in this case, moves to dismiss a proceeding for lack of personal jurisdiction pursuant to CPLR 3211 (a) (8), "the plaintiff must come forward with sufficient evidence, through affidavits and relevant documents, to prove the existence of jurisdiction" (*Fischbarg*, 9 NY3d at 381 n 5 [internal quotation marks omitted], quoting Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C302:5). Plaintiff failed to do so and the Appellate Division thus properly affirmed Supreme Court's order granting defendant's motion to dismiss the complaint (195 AD3d 1337 [3d Dept 2021]).

### B.

CPLR 302 (a) (1) provides for personal jurisdiction over a non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state." "This rule provides two distinct grounds for long-arm jurisdiction: [(1)] where a defendant 'transacts any business' in the state [or (2)] where a defendant 'contracts anywhere to supply goods or services' in the state" (*D&R Global Selections, S.L. v Bodega Olegario Falcon Pineiro*, 29 NY3d 292, 297 [2017], quoting CPLR 302 [a] [1]). Here, plaintiff contended that defendant's conduct satisfied the first ground. It was then plaintiff's

burden to establish that defendant "conducted sufficient activities to have transacted business in the state," and that plaintiff's claims necessarily "arise from the transactions" (*Rushaid v Pictet & Cie*, 28 NY3d 316, 323 [2016]).[1]

The first prong requires an objective inquiry into whether "[a] non-domiciliary defendant[,] . . . 'on [its] own initiative[,] . . . project[ed] [itself] into this state to engage in a sustained and substantial transaction of business' " (*D&R Global*, 29 NY3d at 298, quoting *Paterno v Laser Spine Inst.*, 24 NY3d 370, 377 [2014]; *see Rushaid*, 28 NY3d at 323). "[A] single transaction in New York, out of which the cause of action has arisen, may satisfy the requirement of the transaction of business provision" (*Longines-Wittnauer Watch Co. v Barnes & Reinecke*, 15 NY2d 443, 456 [1965]). However, "[t]he primary consideration [under the first prong] is the quality of the non-domiciliary's New York contacts" (*D&R Global*, 29 NY3d at 298, citing *Fischbarg*, 9 NY3d at 380). While a non-domiciliary need not physically "enter[ ] New York" (*Kreutter v McFadden Oil Corp.*, 71 NY2d 460, 467 [1988]), its transactions will be deemed sufficiently purposeful only where "[the] defendant, through volitional acts, 'avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws' " (*Fischbarg*, 9 NY3d at 380, quoting *McKee Elec. Co. v Rauland-Borg Corp.*, 20 NY2d 377, 382 [1967]). "[P]urposeful availment occurs when the non-domiciliary 'seeks out and initiates contact with New York, solicits business in New York, and establishes a

---

[1] Plaintiff's argument fails on the first prong for the reasons discussed *infra*, and I thus have no occasion to address whether plaintiff's claims arise from the business transactions alleged to have occurred within New York.

continuing relationship' " with a New York-based party (*D&R Global*, 29 NY3d at 298, quoting *Paterno*, 24 NY3d at 377).

C.

Plaintiff failed to establish that defendant "transacted any business within" New York for purposes of CPLR 302(a) (1). First, the impetus for the formation and implementation of the contract was plaintiff's activities in Madagascar and the professor's interest in defendant's product, not defendant's targeted solicitation of business in New York. It is undisputed that soon after the professor was appointed to the Stony Brook University faculty, he contacted defendant—acting as plaintiff's agent—to purchase and arrange for delivery of the two drones to Madagascar. The professor conceived of the plan to use drones in Madagascar and purchased defendant's drones for that purpose; defendant neither "[sought] out" nor "initiate[d] contact with New York" (*Paterno*, 24 NY3d at 377).[2] The law is clear that it is the defendant's purposeful availment of the privilege of conducting business within New York that matters (*see Fischbarg*, 9 NY3d at 380). A plaintiff's actions cannot serve as the basis for personal jurisdiction over a defendant who

---

[2] I do not, as the majority asserts, "confuse[ ] the concept of potential third-party beneficiaries of a commercial agreement with the long-arm jurisdictional inquiry into defendant's activities in New York" (majority op at 10, citing *Fourth Ocean Putnam Corp. v Interstate Wrecking Co.*, 66 NY2d 38, 45 [1985]). The nature of the business transaction between the parties—including their aims, goals and agreed upon terms—is relevant in determining whether defendant intended to transact business within New York (*see Fischbarg*, 9 NY3d at 380).

merely responds to a business opportunity through common email and telephone communications (*see id.* at 383).

Defendant's conduct here contrasts with the defendant's conduct in *Deutsche Bank Sec., Inc. v Montana Bd. of Invs.* (7 NY3d 65 [2006]). There, this Court held that an ongoing business relationship coupled with bilateral negotiations satisfied the transacting business prong of CPLR 302 (a) (1). In that case, all communications were between the defendant's Montana-based agent and the plaintiff's agent in New York City through an instant messaging service designed to facilitate trading (*see id.* at 69). In the 13 months preceding the transaction at issue, the defendant had engaged in several other bond transactions with the plaintiff's New York-based agent, thus "availing itself of the benefits of conducting business here" such that it "had sufficient contacts with New York to authorize our courts to exercise jurisdiction over its person" (*id.* at 72). In the transaction at issue, which took place on the aforementioned instant messaging service, the defendant initially rejected the plaintiff's bond swap proposal. Ten minutes later, the defendant sent a message to the plaintiff expressing interest in a sale, and the two confirmed a bond purchase soon thereafter (*see id.* at 70). The next day, the defendant contacted the plaintiff to "break[ ]" the trade on the grounds that it was allegedly based on insider trading (*id.*). The Court concluded that the defendant's motion to dismiss for lack of personal jurisdiction should be denied because the defendant, as a sophisticated institutional trader, "knowingly initiat[ed] and pursu[ed] a negotiation with a [Deutsche Bank] employee in New York that culminated in the sale of $15 million in bonds" (*id.* at 71-72). The defendant investor's previous participation in New York's bond market through negotiations and bond trades

was critical to the Court's conclusion that the defendant used available electronic means to project itself into New York to conduct business transactions (*see id.* at 71-72). Unlike the defendant in *Deutsche Bank*, defendant here did not use electronic means to project itself into an established New York marketplace. While New York City is a global investment capital, New York State is not a commercial hub for drone purchases. Indeed, defendant's remote agreement to supply two drones outside of New York did not depend on the location of the purchaser and was irrelevant to that sales contract.

Second, defendant's contacts with New York as they related to the subject matter of this dispute—the functioning of the drones—were primarily "responsive in nature" (*Paterno*, 24 NY3d at 378). In *George Reiner & Co. v Schwartz*, the Court concluded that the defendant was subject to personal jurisdiction because he had purposefully entered New York seeking employment, and then "was physically present in New York at the time the contract, establishing a continuing relationship between the parties, was negotiated and made and, the contract, made in New York, was the transaction out of which the cause of action arose" (41 NY2d 648, 653 [1977]). The Court contrasted that visit—which served as the basis for personal jurisdiction—with the one-day visit to New York by the defendant's agent in *McKee* (20 NY2d 377), which fell short of the required level of in-state activity. "[I]n *McKee* there was merely a casual attempt by defendant's representative to look into or smooth out difficulties between plaintiff and plaintiff's customers" (*George Reiner & Co.*, 41 NY2d at 654). The Court also explained that "[t]he *McKee* court expressed valid concern that, were the visit there to serve as a sufficient basis for jurisdiction, then 'every corporation whose officers or sales personnel happen to pass the

time of day with a New York customer in New York runs the risk of being subjected to the personal jurisdiction of our courts' " (*id.*, quoting *McKee*, 20 NY2d at 382).

Defendant's actions here are more analogous to those of the defendant in *McKee* than in *George Reiner & Co.* in that defendant's communications regarding travel to Madagascar to attempt to fix the drones and the CEO's visit to New York were parts of an attempt to "smooth out difficulties" with plaintiff regarding an already completed transaction (*id.*). Unlike *George Reiner & Co.*, where the defendant entered New York to transact business—i.e., enter into a contract—with plaintiff (*see id.* at 653), here, all business was conducted remotely. Both parties entered into an agreement with the understanding that they could perform their contractual obligations without defendant or its products ever entering New York. The CEO's visit to New York to address compliance with the contract, as in *McKee*, occurred *after* the parties had already entered into the contractual relationship that is at the heart of this dispute.

## II.

The majority concludes that plaintiff met its burden based on (1) the initial transaction between the parties; (2) the ongoing communications between the parties with the intent of forming a continuing relationship; and (3) the meeting between the professor and the CEO in New York (*see* majority op at 3-5). None of those grounds are adequate, separately or in the aggregate, to support personal jurisdiction.

First, defendant did not enter or project itself into New York to solicit plaintiff's business through its communications leading up to the initial transaction. The Court has

observed that "the growth of national markets for commercial trade, as well as technological advances in communication, enable a party to transact enormous values of business within a state without physically entering" (*Deutsche Bank Sec.*, 7 NY3d at 71; *accord Fischbarg*, 9 NY3d at 382). Nevertheless, business must be transacted within the state even if technology allows for out-of-state communications in furtherance of that business. For example, in *Parke-Bernet Galleries v Franklyn* (26 NY2d 13 [1970]), the Court held that the non-domiciliary defendant's use of telephonic communications to participate in a New York-based art auction in real time brought the defendant within the personal jurisdiction of our courts. At the defendant's request, the plaintiff established an open telephone line between the defendant and the plaintiff's employee on the evening of the auction (*see id.* at 15). The plaintiff's employee was physically present at the auction and acted as an intermediary by informing the defendant of the bids as they were made and communicating the defendant's bids to the auctioneer who announced them to the other bidders (*see id.* at 15-16). The Court held that, although the defendant was not physically present at the auction, he had nonetheless transacted business within New York because "on his own initiative, the defendant, in a very real sense, projected himself into the auction room in order to compete with the other prospective purchasers who were there" (*id.* at 18). In other words, the real time exchange between the defendant and the plaintiff's employee was the functional equivalent of the defendant sitting in the auction room in New York City with the other bidders (*see id.*). "This activity far exceeded the simple placing of an order by telephone" (*id.*). Here by contrast, the initial transaction between the parties is more like a telephone or online order of goods. Plaintiff initiated communications with

defendant and defendant responded by agreeing to ship two drones to Madagascar. Defendant did not "project[ ] [itself]" into New York "to engage in a sustained and substantial transaction of business" (*Paterno*, 24 NY3d at 377).

Defendant's attempt to "establish a substantial ongoing business relationship" with plaintiff (majority op at 5, citing *Fischbarg*, 9 NY3d at 382-383) also cannot support personal jurisdiction. No communications on this subject occurred in New York or led to the formation of a contract in New York. As they did during the original transaction, the parties contemplated engaging in a business relationship focused on public health issues in Madagascar and other foreign nations.[3] Plaintiff failed to establish how those discussions led to a business relationship resulting in the defendant's transaction of business within New York. Additionally, plaintiff's claims were not based on these efforts. Negotiations to create an ongoing business relationship cannot support a claim of personal jurisdiction for a previous transaction that has no bearing on that potential future relationship.[4]

---

[3] The CEO's description of "the idea to use drones to transport lab samples" as a "shared vision" between the CEO and the professor (majority op at 7 [internal quotation marks omitted]) does not change the analysis. In his affidavit supporting plaintiff's motion to dismiss, the professor said that, although they had communicated in the past about their public health ideas, he initiated contact with the CEO "with the purpose of creating a business relationship between [the parties] . . . for the development and use of [drones] for the delivery of medical supplies to remote areas in underdeveloped countries." As discussed, a plaintiff cannot confer personal jurisdiction on an out-of-state defendant through its own acts (*see Fischbarg*, 9 NY3d at 383). For the same reason, it is irrelevant that Stony Brook University might have enjoyed reputational benefits from its drone program that would have enabled it to expand that program to other foreign nations (*see* majority op at 11).

[4] The majority's reliance on *Stardust Dance Prods., Ltd. v Cruise Groups Intl., Inc.* (63 AD3d 1262 [3d Dept 2009, Stein, J.]) for the proposition that "a far reaching and long-

Finally, defendant's one-time visit to New York to discuss with the professor complaints about the defective drones is insufficient to establish personal jurisdiction. Contrary to the majority's view, the meeting between the professor and the CEO in New York did not "designedly and materially forward[ ] the negotiation and performance of the contract" (majority op at 8 [internal quotation marks omitted], quoting *Dulman v Potomac Baking Co.*, 85 AD2d 676, 677 [2d Dept 1981] [Titone, J., on panel]). Indeed, the majority's reliance on *Dulman* is misplaced because there, the defendant traveled to New York to inspect and purchase an industrial oven *before* the sale and to hasten performance of the contract (*see* 85 AD2d at 676-677). Here, the defendant's CEO traveled to New York *after* defendant had purportedly breached its contract with plaintiff.

Moreover, plaintiff alleges in its complaint that defendant breached the contract between the parties by (1) "provid[ing]" drones "in a defective, damaged, non-conforming, [and] unsatisfactory condition" that were "otherwise unfit for their intended purpose," and (2) "fail[ing] to replace the non-conforming [drones] within a reasonable time." The premise for the majority's conclusion that the purpose of the parties' in-person meeting was "to modify the terms of their agreement" (majority op at 10) is unclear and unsupported by the plaintiff's assertions. Plaintiff did not—and has never—alleged that the parties

---

standing relationship" existed here (*see* majority op at 8) is misplaced. There, the Court concluded that plaintiffs had made a "sufficient start" toward proving personal jurisdiction, warranting a jurisdictional hearing, where defendant had twice visited New York in furtherance of a contractual joint venture between the parties and the parties had submitted conflicting affidavits regarding the nature of defendants' contacts with New York (*Stardust*, 63 AD3d at 1265). Here, by contrast, the parties did not enter into a joint venture and the nature of defendant's contacts with New York are not at issue.

entered into an initial contract which was thereafter modified following the CEO's visit to New York. A request for a refund or to exchange a defective product and a subsequent promise to do so does not modify the contract, but rather represents an agreement to either settle damages in advance of litigation or perform one's already existing obligations, respectively (*see e.g. Robinson v Jewett*, 116 NY 40, 53 [1889] ["The performance of an act which the party is under a legal obligation to perform cannot constitute a consideration for a new contract"]; *see also* UCC 2-508 [1] ["Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of (its) intention to cure and may then within the contract time make a conforming delivery"]). Thus, properly understood, the complaint alleged that (1) defendant breached the contract, (2) plaintiff sought performance upon determining that there was a breach, and (3) defendant thereafter abandoned its contractual obligations (*see e.g. Henderson Tire & Rubber Co. v Wilson & Son, Inc.*, 235 NY 489, 499 [1923]).

## III.

Even if defendant's actions constituted the transaction of business within New York under CPLR 302 (a) (1), the "[e]xercise of personal jurisdiction under the long-arm statute must comport with federal constitutional due process requirements" (*Rushaid*, 28 NY3d at 330, citing *LaMarca v Pak-Mor Mfg. Co.*, 95 NY2d 210, 216 [2000]). This Court has adopted a two-pronged analysis under the federal constitutional standard:

> "Federal due process requires first that a defendant have minimum contacts with the forum state such that the defendant should reasonably anticipate being haled into court there, and second, that the prospect of having to defend a suit in New York comports with traditional notions of fair play and substantial justice" (*D&R Global*, 29 NY3d at 300 [cleaned up]; *accord World-Wide Volkswagen Corp. v Woodson*, 444 US 286, 297 [1980]; *International Shoe Co. v Washington*, 326 US 310, 316 [1945]; *LaMarca*, 95 NY2d at 216).

Under the "minimum contacts" analysis, this Court evaluates whether a defendant has purposefully availed itself of the privilege of conducting business within New York (*see D&R Global*, 29 NY3d at 300; *Rushaid*, 29 NY3d at 331; *LaMarca*, 95 NY2d at 217). "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous' " (*Ford Motor Co. v Montana Eighth Judicial Dist. Court*, 592 US —, —, 141 S Ct 1017, 1025 [2021], quoting *Keeton v Hustler Magazine, Inc.*, 465 US 770, 774 [1984]). Moreover, "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over [it]"; "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction" (*Walden v Fiore*, 571 US 277, 285-286 [2014]; *accord Burger King Corp. v Rudzewicz*, 471 US 462, 478 [1985]; *Rush v Savchuk*, 444 US 320, 332 [1980]; *Kulko v Superior Court of Cal., City and County of San Francisco*, 436 US 84, 93 [1978]). For the same reasons defendant's conduct fails to establish jurisdiction under our long arm statute (discussed at length, *supra*), the conduct also fails to satisfy this prong of the due process standard. In brief, plaintiff's agent, not defendant, initiated the sales agreement. Crucially,

the parties negotiated and finalized the contract remotely, a convenient means to close the

deal on this out-of-state sale and delivery.[5]

Nor would New York's exercise of personal jurisdiction over defendant comport

with traditional notions of fair play and substantial justice. It would be unreasonable to

require defendant to litigate the underlying claims in our state given that defendant has no

existing business relationship with plaintiff, did not visit New York to negotiate or finalize

the sales purchase, and this contract dispute involves drones sent directly to Madagascar

for the use and benefit of the people on that island (*see D&R Global*, 29 NY3d at 300

[noting that a defendant must show that "the exercise of jurisdiction is unreasonable"],

citing *LaMarca*, 95 NY2d at 218). The applicable rules guiding this step of the analysis

---

[5] The majority reads far too much into the phrase "directly from the factory floor to Madagascar" in asserting that I have "conflate[d]" the two separate grounds of CPLR 302 (a) (1) (majority op at 11 n 3). I am not suggesting that plaintiff failed to show that defendant contracted to supply goods in New York. Rather, as I have discussed, our case law requires us to evaluate the location of the drones and their nexus with defendant's contacts with New York.

Notably, the contracting ground of CPLR 302 (a) (1) long-arm jurisdiction—which applies when a defendant "contracts anywhere to supply goods or services" in New York State— confirms the legislative distinction between a sale of goods to be provided in-state (which can be made anywhere), and an out-of-state sale for goods which are not sent to New York (*see e.g.* Alexander, Prac Commentaries, CPLR C302:9; David D. Siegel & Patrick M. Connors, New York Practice §§ 86-86A [6th ed, Dec. 2022 update]). The former, by its nature, involves a defendant's volitional act to send its products to New York and makes plain that defendant has "avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws" (*McKee*, 20 NY2d at 382). This obvious contact with the state is missing from a non-domiciliary's agreement made remotely to send its products directly to an out-of-state recipient. Thus, the transacting business ground of the statute requires that the defendant's contacts amount to a transaction within the state—and not merely a remote sale to a New York party—in order to subject the defendant to legal action in our courts arising from that sale.

"derive from and reflect two sets of values—treating defendants fairly and protecting 'interstate federalism' " (*Ford Motor Co.*, 592 US at —, 141 S Ct at 1025, quoting *World-Wide Volkswagen Corp.*, 444 US at 293; *see Bristol-Myers Squibb Co. v Superior Court of Cal., San Francisco Cty.*, 582 US —, —, 137 S Ct 1773, 1780-1781 [2017]). Exercising personal jurisdiction over defendant here does not comport with those values.

IV.

This case involves a purchase by telephone and email of a product manufactured outside of New York, designed to specifications serving the needs of non-New Yorkers, and sent directly from the factory floor to Madagascar. On these facts, defendant did not transact business within New York but merely entered a contract with a New York client for a product sent to and used in another country. Therefore, I agree with both courts below that New York lacks personal jurisdiction over defendant for the claims plaintiff asserted in this action. Plaintiff could avoid future personal jurisdiction disputes by doing what it failed to do here: ensure that its employees go through the proper procurement process[6] and, for good measure, require a forum selection clause in its contracts if it wishes to engage in business dealings with similarly situated non-domiciliary potential business partners.

---

[6] As the Appellate Division noted, the parties' contract did not go through the usual statutory "bidding and contractual process" (195 AD3d at 1337 n 1, citing State Finance Law § 163).

Order reversed, with costs, and defendant Vayu, Inc.'s CPLR 3211 (a) (8) motion to dismiss the complaint denied. Opinion by Judge Garcia. Acting Chief Judge Cannataro and Judges Wilson, Singas and Troutman concur. Judge Rivera dissents and votes to affirm in an opinion.

Decided February 14, 2023